**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAIMARIA BODOR,<br>individually and on behalf of all<br>others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>MAXIMUS FEDERAL SERVICES, INC.,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 5-19-cv-05787-JMG

**JURY TRIAL DEMAND**

---

## AMENDED CLASS ACTION COMPLAINT

### Introduction

1.     Defendant Maximus Federal Services, Inc. ("Maximus"), a debt collector collecting student loans owed to the U.S. Department of Education ("Department"), has repeatedly engaged in debt collection activity that results in the illegal seizure of federal payments or garnishment of wages.  Once a borrower has submitted a Borrower Defense to Repayment ("Borrower Defense") application, collection activity must cease until a decision is made on the Application.  Maximus, however, routinely ignores this automatic stay.

2.     Plaintiff Jaimaria Bodor obtained federal student loans in order to attend an online business management and administration program at Everest College, a school owned and operated by the now-defunct Corinthian Colleges, Inc. ("Corinthian").  Bodor claims that due to misrepresentations made by Corinthian, she is statutorily eligible for a loan discharge.  She submitted a Borrower Defense application to the Department and she was entitled to an automatic hold on all collection activity while her Borrower Defense application was pending.

Maximus failed to follow the law, resulting in injury to Plaintiff.

3.      Maximus, a corporate debt collector, has violated federal regulations and explicit instructions from the Department to cease collection activity during the pendency of a Borrower Defense application. Maximus subjected Plaintiff, and the class that she seeks to represent, to continuing involuntary collection activity.

4.      Bodor asserts claims individually and on behalf of a class of similarly situated persons against Maximus for engaging in abusive, deceptive, and unfair debt collection practices prohibited by the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*

## Jurisdiction

5.      Jurisdiction of this Court arises under 28 U.S.C. § 1331 and 15 U.S.C. § 1692k(d).

6.      Venue is proper because Bodor resides in this District, Defendant Maximus transacts business in this District and the debt collection activity at issue in this case occurred in this District.

## Parties

7.      Plaintiff Jaimaria Bodor is a natural person who resides in Wind Gap, Northampton County, Pennsylvania. She is a "consumer" as that term is defined by 15 U.S.C. § 1692a(3).

8.      Defendant Maximus Federal Services, Inc., is a Virginia corporation with its principal place of business in Reston, Virginia. Maximus is a debt collector, as that term is defined in 15 U.S.C. § 1692a(6).

**Maximus is a Debt Collector**

9.      The Department does not itself service or engage in debt collection of federal

student loans, a process that includes collecting payments and performing other administrative

tasks. Instead, the Department contracts with multiple private entities to perform these functions,

each of which has its own contract with the Department and its own "unique system, processes,

and procedures."  *See* 20 U.S.C. § 1087f (directing the Secretary to enter contracts with entities

to provide loan origination, servicing and collection).

10.     Soon after the Department approves and disburses a student loan, it assigns that

loan to one of a number of federal student loan servicers.  In general, the loan remains with that

servicer until it is repaid in full or cancelled.

11.     If a student loan borrower falls more than 270 days behind on their payments, the

Department considers the loan to be in default. After 360 days of non-payment, the servicer must

transfer the loan to Maximus.

12.     According to the Department's website, Defendant "MAXIMUS Federal

Services, Inc., is the loan servicer for defaulted federal student loans."[1]

13.     The total value of Maximus's contract is over $848 million.[2]

14.     Maximus regularly engages in a variety of activities to collect on defaulted

student loans.  Maximus is responsible for operating and maintaining the Department's Debt

Management and Collection System. Maximus also runs a call center to address borrower

inquiries and complaints, sends dunning notices, collects payments, and refers accounts for

involuntary collection.  In addition, Maximus refers some delinquent accounts to private debt

---

[1] *See* Department of Education, *Student Loan Delinquency and Default*, available at
https://bit.ly/3f1ww0v (viewed Apr. 29, 2020).

[2] *See* GovTribe, *Definitive Contract EDFSA13C0021*, available at https://bit.ly/3bMmw9q
(viewed Apr. 29, 2020).

collectors.

15.     Maximus acts pursuant to the Debt Collection Improvement Act, 31 U.S.C.

§ 3701 *et seq.*, which in some circumstances permits amounts owed to the federal government to

be collected involuntarily through seizures of federal payments and the garnishment of wages--

all without a court order.

16.     The program for withholding federal payments, including income tax refunds, is

called the Treasury Offset Program ("TOP").

17.     On information and belief, in December 2019, Maximus sent a request to

Treasury to offset alleged balances on student loan debt against tax refunds owed to Plaintiff and

proposed class members.

### The Borrower Defense Rule

18.     Bodor's loans, and the loans of the putative class members she seeks to represent,

were in default at the time that they were transferred to Defendant Maximus.

19.     Under the Higher Education Act, federal loan borrowers are eligible for loan

discharges if they obtained their loan to attend a college or university that misled them or

engaged in other misconduct. Applications for this form of loan discharge are commonly called

"Borrower Defense to Repayment" or "Borrower Defense" applications. Borrowers submit

Borrower Defense applications to the Department.

20.     Regulations governing the Borrower Defense application process and explicit

Department instructions to its servicers state that involuntary collection activity should cease

"[u]pon receipt of a borrower's application" unless a borrower affirmatively states on the

application itself that collection activity should continue during the pendency of the application.[3]

21.     As part of its contract with the Department, Maximus is responsible for initiating forbearances and ceasing collection activities for borrowers who submit Borrower Defense applications.

22.     Maximus is also responsible for managing the Department's submissions to TOP. TOP is a fully automated, computerized system that manages the collection of delinquent state and federal debts by intercepting or reducing payments disbursed by state and federal agencies to debtors. Government creditors submit debts to TOP and they certify eligibility for the offset. Maximus submits debts to TOP and it certifies eligibility for the offset on behalf of the Department.

23.     Maximus is also responsible for managing the Administrative Wage Garnishment program. To do this, Maximus must send notices to employers, instructing them to garnish or to cease garnishing the wages of student loan borrowers.

24.     Maximus processes corrective refunds to borrowers when federal payments are wrongfully offset, or wages are wrongfully garnished, and it is responsible for and capable of ensuring that such refunds issue to Plaintiff and the proposed class.

**Maximus Routinely Violates the Protections
of the Borrower Defense Application Process**

25.     In violation of federal regulations and explicit instructions provided by the

---

[3] *See* 34 C.F.R. § 685.222(e)(2)(ii) (requiring Education Secretary to suspend collection activity on defaulted loans upon receipt of borrower defense application); *Calvillo Manriquez v. DeVos*, No. 17-cv-07210, ECF No. 111-3 (N.D. Cal. Dec. 20, 2017) (Compliance Report in Response to ECF 110 Attach. 1) (Exhibit A attached hereto) (business operations change request No. 4753 assigning Maximus task of processing stop collection requests following receipt of borrower defense applications); *id.* ECF No. 111-7 (Compliance Report in Response to ECF 110 Attach. 5) (Exhibit B) (reiterating instructions in change request No. 4753 in letter to Maximus and other servicers).

Department on numerous occasions, Defendant Maximus caused Bodor and the putative class members to suffer federal payment offsets and wage garnishments after they were entitled to a cessation of collections pending adjudication of their Borrower Defense applications.

26.    The Department is currently a defendant in *Calvillo Manriquez v. DeVos*, Case No. 17-cv-07210-SK (N.D. Cal.), a suit by former students of Corinthian College, a predatory for-profit college chain that ceased operations and declared bankruptcy in 2014-15.  The students claim they were entitled to relief under the Borrower Defense Rule and that the Department failed to comply with the law governing applications under the Rule.

27.    In May 2018, the Court granted a preliminary injunction and ordered the Department to cease all efforts to collect debts from borrowers who fit the criteria of the putative class.  Yet the Department admitted in September 2019 that thousands of putative class members received incorrect notices that payments were due on their loans or were subject to wage garnishment and offsets of federal payments.  The Department has estimated that 1,103 people who submitted Borrower Defense applications nonetheless were subject to involuntary collection activity including wage garnishment and federal payment offsets.[4]  This estimate is limited to borrowers who attended a specific school—Corinthian—so there are likely many other affected people who attended other schools.

28.    The Department is continuing to update the number of people impacted in the *Calvillo Manriquez* case.  Thus, this figure is likely to increase in coming months.

---

[4] *Manriquez v. DeVos*, No. 17-cv-07210 (N.D. Cal. Dec. 20, 2017), ECF No. 205-2, *8 (Sixth Compliance Report in Response to ECF 130) (Exhibit C attached hereto).

29.     As of December 31, 2018, over 158,000 borrower defense claims by students were awaiting action by the Department, including those who had attended Corinthian Colleges, ITT, Argosy and the Art Institute.[5]

### Background on Plaintiff and
### Her Borrower Defense Application

30.     Bodor attended Everest College, a Corinthian school, online beginning in August 2012, seeking a business management and administration degree.  Corinthian held itself out as offering quality vocational training programs that consistently placed graduates in desired jobs. Like so many of her classmates, Bodor incurred substantial debt to attend a Corinthian program that wasted her time and provided no value.

31.     Bodor submitted a Borrower Defense application to the Department in late February or early March 2019.

32.     Bodor did not agree that collection activity could proceed during the pendency of her application.

33.     Bodor filed her federal income tax return on or about April 15, 2019.

34.     As a direct result of Maximus's failure to rescind its directive to Treasury to offset Bodor's alleged debt against her tax refund, the entire tax refund of $79 was withheld.

35.     Bodor's Borrower Defense application is still pending.

36.     Bodor did not receive a refund of her $79 until October 2019, approximately six months after it was withheld.

### Class Allegations

37.     Plaintiff Bodor brings this action pursuant to Rule 23(a) and (b)(3) of the Federal

---

[5] The Institute for College Access and Success, *What to Know about the Borrower Defense to Repayment Rule,* available at https://bit.ly/35nbmFy (viewed May 1, 2020).

Rules of Civil Procedure on behalf of the following class: All borrowers of federal student loans owned by the Department who (1) at any time from Dec. 9, 2018 to the date of trial, inclusive, had tax refunds or other federal payments offset or wages garnished for repayment of federal student loans (2) while they had a pending or approved Borrower Defense application and (3) had not stated on the Borrower Defense application that collection activity could continue during the pendency of the application (the "Class").

38.     Excluded from the Class are:

a.  Maximus and any entities in which Maximus has a controlling interest;

b.  Any entities in which Maximus's officers, directors, or employees are employed and any of the legal representatives, heirs, successors or assigns of Maximus;

c.  Any federal, state, or local governmental entities;

d.  The Judge and/or jury to whom this case is assigned and any member of the Judge's or jury's immediate family and any other judicial officer or juror assigned to this case; and

e.  Any attorneys representing Plaintiff or the Class.

39.     <u>Numerosity—Fed. R. Civ. P. 23(a)(1)</u>.  The members of the Class are so numerous that joinder of all members is impracticable. The exact number or identification of the Class members is presently unknown. On information and belief, the Class includes thousands of individuals across the country. The identity of the Class members is ascertainable and can be determined based on available records maintained by Maximus and/or the Department, which are known to exist based on evidence revealed in the *Calvillo Manriquez v. DeVos* case.  As of December 31, 2018, over 158,000 borrower defense claims by students were awaiting action by

the Department, including those who had attended Corinthian Colleges, ITT, Argosy and the Art Institute. Thus, the numerosity requirement is easily satisfied here.

40.    Predominance of Common Questions—Fed. R. Civ. P. 23(a)(2), 23(b)(3).  There are multiple questions of law and fact common to the Class that will predominate over questions affecting only individual Class members. The core question in this case is a legal one: whether Defendant Maximus violated the FDCPA by taking actions to initiate collection or to allow involuntary collection activity to proceed, despite the fact that there was a pending Borrower Defense application. Such an inquiry includes several common questions of law, including whether Maximus was a "debt collector," whether federal regulations prohibit garnishments and the offset of federal payments while a Borrower Defense application is pending unless the borrower agrees otherwise, whether Defendant's failure to rescind a request for offset or garnishment upon receipt of a Borrower Defense application constitutes a misrepresentation, whether such failure constitutes taking action not permitted by law, whether Defendant acted intentionally and whether its activities violate the FDCPA. Bodor is seeking (i) the recovery of all the sums certain improperly collected by Maximus involuntarily within the applicable statutory period that have not yet been reimbursed; and (ii) statutory damages, for herself and the members of the proposed class.

41.    Typicality—Fed. R. Civ. P. 23(a)(3). Bodor's claims are typical of the claims of the Class because Bodor and all putative Class members were subject to, and affected by, Maximus's systemic policies and practices alleged herein.

42.    Adequacy—Fed. R. Civ. P. 23(a)(4); 23(g)(1). Bodor is an adequate representative of the Class because she is a member of the class and her interests do not conflict with the interests of the members of the Class she seeks to represent. Bodor is represented by

experienced and competent Class Counsel. Class Counsel have litigated scores of class actions, including cases brought under the FDCPA. Bodor's counsel intends to prosecute this action vigorously for the benefit of the entire Class. Bodor and Class Counsel can fairly and adequately protect the interests of all of the Members of the Class.

43.    <u>Superiority—Fed. R. Civ. P. 23(b)(3)</u>. The class action is superior to other available methods for fairly and efficiently adjudicating this controversy because individual litigation of Class members' claims would be impracticable and individual litigation would be unduly burdensome to the courts. Without the class action vehicle, the Class would have no reasonable remedy and would continue to suffer losses. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. There is no foreseeable difficulty in managing this action as a class action and it provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

## COUNT I

## THE FAIR DEBT COLLECTION PRACTICES ACT, 15 U.S.C. § 1692e

## FALSE OR MISLEADING REPRESENTATIONS

44.    Plaintiff incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

45.    15 U.S.C. § 1692e provides that a debt collector may not use "any false, deceptive, or misleading representation or means in connection with the collection of any debt."

46.    15 U.S.C. § 1692e(2)(A) further provides that it is a violation to make a "false representation of . . . the character, amount, or legal status of any debt."

47.     Bodor and all class members are "consumers" as that term is defined in 15 U.S.C. § 1692a(3) because they are natural persons allegedly obligated to pay the student loan debt Maximus sought to collect.

48.     Federal student loans are "debts" as that term is defined in 15 U.S.C. § 1692a(5) because they are obligations by a consumer, in this case Bodor and class members, to pay money arising out of a transaction in which the money is used for a personal, family, or household purpose, in this case higher education intended for personal growth.

49.     Maximus is a debt collector as that term is defined in 15 U.S.C. § 1692a(6) because it uses instrumentalities of interstate commerce or the mail, and it regularly collects or attempts to collect debts owed or asserted to be owed or due another, in this case the Department.

50.     Class members' student loans were over 270 days delinquent and considered in default by the Department when they were transferred to Maximus. Therefore, Maximus is a "debt collector."

51.     Maximus pursued involuntary collection activities against Class members despite the fact that each had submitted a Borrower Defense application that did not expressly authorize collection activities to continue.

52.     These actions violated federal regulations and instructions issued by the agency on whose behalf it was acting—the Department.

53.     Defendant Maximus is in charge of communicating the U.S. Department of Treasury whether they should offset federal payments or to employers whether they should garnish wages for defaulted student loan debt. These parties trust and rely on Maximus providing accurate and up-to-date information in these communications, and they follow Maximus's directions. For each class member, Maximus made representations authorizing garnishments and

offsets which became false when each class member submitted a Borrower Defense application. For each class member, federal payments were offset or wages garnished as a result of those communications. For each class member, neither the federal payment offsets nor the wage garnishments were permitted by law.

54.     Therefore, Defendant violated 15 U.S.C. § 1692e by using false, deceptive, and/or misleading representations or means in connection with the collection of class members' federal student loans.

## COUNT II

## THE FAIR DEBT COLLECTION PRACTICES ACT, 15 U.S.C. § 1692f

## UNFAIR PRACTICES

55.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

56.     15 U.S.C. § 1692f prohibits a debt collector from using any unfair or unconscionable means to collect or attempt to collect any debt.

57.     15 U.S.C. § 1692f(1) further provides that it is a violation to collect any amount "unless such amount is expressly authorized by the agreement creating the debt or permitted by law."

58.     The Department's regulations and instructions regarding refraining from collecting debts during the pendency of Borrower Defense applications unless borrowers opt into collection, made any collection activity during the pendency of the Borrower Defense applications unlawful.

59.     Maximus caused federal payments or wages to be withheld from Bodor and other class members during the pendency of their Borrower Defense applications.

60.     Causing federal payments to be withheld and wages to be garnished to repay federal student loans are acts of collecting a debt.

61.     Maximus violated 15 U.S.C. § 1692f(1) by collecting on debts where it was not permitted by law.

62.     In addition, the above-described actions violate 15 U.S.C. § 1692f because they are unfair and unconscionable means to collect defaulted student loan debt.

## Prayer for Relief

WHEREFORE, Plaintiff prays that this Court:

1.  Certify this action as a Class Action under Rule 23(a) and (b)(3) and appoint Jaimaria Bodor as representative of the Class and her attorneys as Class Counsel;

2.  Find that Maximus violated 15 U.S.C. §§ 1692e and 1692f.

3.  Enter judgment in favor of Bodor and the Class and against Maximus for the (i) recovery of all the sums certain improperly collected by Maximus as wage garnishments and/or federal benefit offsets within the applicable statutory period that have not yet been reimbursed; and (ii) maximum amount of statutory damages provided under 15 U.S.C § 1692k.

4.  Award the Class costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3);

5.  Grant such other further relief as is necessary and proper.

## Jury Demand

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, for all issues triable of right by a jury.

Dated:  May 14, 2020                         Respectfully submitted,

                                             */s/ Cary L. Flitter*
                                             Cary L. Flitter
                                             Andrew M. Milz
                                             Flitter Milz, P.C.
                                             450 N. Narberth Avenue
                                             Narberth, PA 19072
                                             (610) 822-0782 tel
                                             (610) 667-0552 fax
                                             cflitter@consumerslaw.com
                                             amilz@consumerslaw.com

                                             Stuart T. Rossman* (MA BBO #430640)
                                             Persis Yu* (MA BBO #685951)
                                             National Consumer Law Center
                                             7 Winthrop Square, 4th Floor
                                             Boston, MA 02110
                                             (617) 542-8010 tel.
                                             (617) 542-8028 fax
                                             srossman@nclc.org
                                             pyu@nclc.org

                                             Joanna K. Darcus
                                             National Consumer Law Center
                                             1001 Connecticut Avenue NW, Suite 510
                                             Washington, DC 20036
                                             (202) 452-6252 tel.
                                             (202) 296-4062 fax
                                             jdarcus@nclc.org

                                             Benjamin Elga*
                                             Brian Shearer*
                                             Craig L. Briskin**
                                             Justice Catalyst Law, Inc.
                                             81 Prospect Street
                                             Brooklyn, NY 11201
                                             (518) 732-6703 tel.
                                             belga@justicecatalyst.org
                                             brianshearer@justicecatalyst.org
                                             cbriskin@justicecatalyst.org

                                             COUNSEL FOR PLAINTIFF

                                             *Admitted Pro Hac Vice
                                             **Pro Hac Vice Application Forthcoming

# EXHIBIT "A"

# Business Operations Change Request Form

**As Of: 6/28/18 10:28:51AM**

| Administrative Information |
|---|

**CR:** 4753          **Drafted:** 6/27/18 4:21:49PM          **Submitted:**

**Title:** FSA CEMS Borrower Defense Enhancements impacting Servicers

**Sponsor:** Sara Hayhurst          **Business Analyst:**

**Anticipated Implementation Date:** 07/29/2018

| Change Request Details |
|---|

**Reason (Business Need):**

FSA is making enhancements to the Customer Engagement Management System's (CEMS) Partner Portals on July 29, 2018. These enhancements update the servicer requirements for assisting FSA with processing forbearance and performing post-determination activities on customers with approved or denied borrower defense applications.

**Description (Requirements):**

1. The servicer shall access FSA's Customer Engagement Management System (CEMS/ system) Salesforce.com Partner Portal daily to identify any tasks assigned to the servicer.
a. Tasks assigned to the servicer shall include:
• Forbearance Requests – Non-Defaulted servicers
• Stop Collection Requests – Default servicer
• Borrower Defense Application (Claim) Approvals – all servicers
• Borrower Defense Application (Claim) Denials – all servicers
• Inquiries – all servicers
b. The servicer shall provide FSA with the anticipated volume of users needing access to CEMS in order to complete Borrower Defense (BD) tasks within required standards. The anticipated volume shall be included in the impact assessment to this change request.
• The servicer shall provide the email addresses of the users once this CR has been approved. FSA will provide directions and send these resources user access forms to be filled out. FSA will then process their access to CEMS prior to go-live.
• Requests to remove users, add new/ different users shall be coordinated through the CEMS ISSO (Shavon.holland@ed. gov).
2. The servicer shall participate in CEMS Partner Portal training for Borrower Defense.
a. The servicer resources/ users supporting borrower defense tasks attend a virtual training on July 19, 2018 from 9:00 A. M. Eastern time to 12:00 P.M. Eastern time. This training will explain in detail how to identify each of the BD tasks and how to update CEMS once the task has been completed on the servicer's system.
3. The non-default servicer shall process forbearance requests as requested via CEMS.
a. The non-default servicer shall identify all CEMS requests for forbearance and apply the forbearance to the borrower account with 5 business days of the request.
b. The non-default servicer shall follow existing requirements when applying forbearance to accounts for borrower defense ,including:
• Servicers shall apply a non-capping Administrative forbearance covering/ resolving any prior delinquency (to bring current) and remain on forbearance until FSA instructs the servicer to remove the forbearance (once the borrower defense application has been decided/resolved). If the borrower is currently in deferment (or in $0.00 IDR plan) the borrower shall remain in that deferment/ plan but if that deferment/ plan ends prior to FSA instructing the servicer to remove the forbearance, an administrative forbearance shall be applied after the deferment/ plan end so that borrower remains in forbearance until FSA instructs the servicer to remove the forbearance. The servicer shall also continue to notify the borrower of IDR plan renewals and other existing IDR notifications.
c. The non-default servicer shall upload a copy of the documentation sent to the borrower related to this forbearance to CEMS (training/ documentation will be provide on how to upload the information). The servicer shall ensure a copy of any/ all notices to the borrower related to the forbearance is uploaded.
d. The non-default servicer shall ensure the application of the forbearance is annotated in the servicer system.
e. The servicer shall update CEMS to include the action taken on the account including: The date the forbearance was

bocm00036264

applied; The beginning date of the forbearance; if the borrower was not place on forbearance provide explanation why not placed on forbearance (training/ documentation will be provide on how to update CEMS).

4.   The default servicer shall process stop collection requests as requested via CEMS.

a.   The default servicer shall identify all CEMS requests for stopped collections and apply the proper tags to the borrower account with 5 business days of the request.

b.   The default servicer shall upload a copy of the documentation sent to the borrower related to this stoppage of collections to CEMS (training/documentation will be provide on how to upload the information).  The non-default servicer shall ensure a copy of any/all notices to the borrower related to the stoppage of collection is uploaded (if any notices are sent).

c.   The default servicer shall ensure the application of the stoppage of collections is annotated in the default servicing system/

d.   The servicer shall update CEMS to include the action taken on the account including: The date the forbearance was applied; The beginning date of the forbearance; if the borrower was not place on forbearance provide explanation why not placed on forbearance (training/ documentation will be provide on how to update CEMS).

5.   The servicer shall process borrower defense application approvals as requested via CEMS.

a.   The servicer shall identify all CEMS application approvals and review the approval request in detail to identify the actions to be taken. All information needed to apply the approval will be provided via CEMS and all instructions shall be followed when applying claim/ application approvals. (training/documentation will be provided on how to identify the approval requests and instructions)

b.   Any questions about the borrower defense application approvals/ instructions shall be directed to sara.hayhurst@ed.gov.

c.   The servicer shall upload a copy of the documentation sent to the borrower related to the approval to CEMS.

d.   The servicer shall update CEMS (see table 1) with all information relevant to processing of the approval.

e.   The servicer shall complete all approval requests within 15 business days of the request.

6.   The servicer shall process borrower defense application denials as requested via CEMS.

a.   The servicer shall identify all CEMS borrower defense application denials and review the request in detail to identify the actions to be taken. All information needed to apply the approval will be provided via CEMS and all instructions shall be followed when applying borrower defense application denials. (training/ documentation will be provided on how to identify the denial requests and instructions)

b.   Any questions about the borrower defense approvals/ instructions shall be directed to sara.hayhurst@ed.gov.

c.   The servicer shall upload a copy of any documentation sent to the borrower (if any) related to the denial to CEMS.

d.   The servicer shall update CEMS (see table 1) with all information relevant to processing of the approval.

e.   The servicer shall complete all denial requests within 15 business days of the request.

7.   The servicer shall process inquiries as requested via CEMS.

a.   The servicer shall identify all CEMS borrower defense application denials and approvals, and the servicer shall review the request in detail to identify the actions to be taken. All information needed to apply the approval or denial will be provided via CEMS and all instructions shall be followed when applying borrower defense approvals or denials. (training/ documentation will be provide on how to identify inquires and how to respond)

b.   Any questions about the borrower defense applications for  approvals or denials /instructions shall be directed to sara.hayhurst@ed.gov.

c.   The servicer shall respond to all inquiries within 3 business days of the request.

8.   The servicer shall upload any correspondence sent to or received from the borrower related to borrower defense to CEMS.

a.   The servicer shall identify any incoming or outgoing correspondence related to borrower defense and upload the information to CEMS within 5 business days of receipt at the servicer location.

b.   The servicer will be provided access to all borrower defense information for borrowers they service (Table 1 reference).

c.   The servicer shall update all training and procedures related to borrower defense inquiries to understand that borrowers may refer to the unique number in CEMS when referring to a borrower defense claim/application or inquiry.

d.   The servicer shall have the ability in CEMS to view activities and attachments related to the borrower defense application.

9.   The servicer shall support the transition to the new borrower defense platform and processes.

a.   The servicer shall continue to accept and process forbearance/ stop requests as identified in CR 4585 until FSA instructs they are no longer required to do so.

b.   The servicer shall support/ respond to requests for borrower defense information to support the transition. This may include specific inquiries or query requests (not to exceed 25 hours total work by the servicer resources).

c.   The servicer shall update all procedures, documentation, and borrower facing websites/ communication to support the transition to the new platform and processes. Any updates shall be provided to FSA on demand. NOTE: The updates do not impact any Borrower Defense phone numbers, postal mailing address, email addresses, or website URLS. Those contact points are:

•   BD Hotline: 1-855-279-6207.

•   Email: BorrowerDefense@ed.gov

•   Postal Mail: U.S. Dept. of Education – Borrower Defense to Repayment, P.O. Box 1854, Monticello, KY 42633

bocm00036264

- URLs:
- https://BorrowerDischarge.ed.gov (direct link bypassing studentaid.gov to the online application)
- studentaid.gov/borrower-defense

Note: Servicing users will be required to attend training on 7/19/2018 on the new enhancements.

**Does this change require a new network connection**
**(Secure File Transfer Protocol is mandatory for all new connections)?**    No

**IST Anticipated?**    No

---

| FSA Service/System/Area Impacted |
|:---:|

**Validation - Artifacts and Corresponding Requirement IDs (Required for Services)**
  Compliant Statement

**Artifacts Due Date:** 07/29/2018      **BU Reviewer:**    Sara Hayhurst

bocm00036264

# EXHIBIT "B"



April 1, 2019

RE: Borrower Defense Forbearances/ Stopped Collection Activity Requests

Dear Federal Loan Servicers and Debt Management Collection System (DMCS):

As you are aware, we have a new platform—the Customer Engagement Management System (CEMS)—which handles forbearances and stop collection requests for borrowers with pending borrower defense applications. To implement the new platform, we issued CR 4753. The CR instructed you that, after implementation, you would apply forbearance/ stopped collection activity request indefinitely until we provide you notice to the contrary. Aside from the proper administration of our programs, it is essential that these contractual requirements be honored to ensure that we are compliant with court orders.

Nevertheless, we have identified borrowers who should have been in forbearance/ stopped collection activity who were not. To assist you in complying with your contractual requirement and court orders, and to respect court orders, we have sent you a notice of borrowers for who we could not confirm that you have complied with your contractual requirements. If a borrower about whom you receive notice whom made a payment because of your error, you must refund that payment to the payer. While our initial notice focuses on your requirements regarding the court order, we may need to send you additional notices to ensure that all borrowers have their rights respected. We expect that we will not need to send this notice again.

For the impacted borrowers you must adhere to the requirements in CR 4753, in which you agreed to:

- Apply a non-capping administrative forbearance to the borrower listed in the attached file to cover or resolve any prior delinquency and to bring the borrower current.
- Keep the borrower on forbearance until we instruct you to remove the forbearance.
- If the borrower is currently in deferment or in $0.00 IDR plan, to keep the borrower in that deferment or plan. If that deferment or plan ends prior to FSA instructing you to remove the forbearance, you must apply an administrative forbearance after the deferment/plan ends so the borrower remains in forbearance until we instruct you to remove the forbearance.
- If applicable and consistent with the above, refund payments that the borrower made due to forbearance or stopped collection lapse.

We appreciate, but expect your diligence in ensuring that you comply with your servicing contracts and court orders.

Sincerely,

Borrower Defense Team





April 8, 2019

RE: Borrower Defense Forbearances/ Stopped Collection Activity Requests

Dear Federal Loan Servicers and Debt Management Collection System (DMCS):

As you are aware, we have a new platform—the Customer Engagement Management System (CEMS)—which handles forbearances and stop collection requests for borrowers with pending borrower defense applications. To implement the new platform, we issued *CR4753: FSA CEMS Borrower Defense Enhancements Impacting Servicers*. The CR instructed that, after implementation, servicers would apply forbearance/ stopped collection activity requests indefinitely until FSA provides a notice to the contrary. Aside from the proper administration of our programs, it is essential that these responsibilities be honored to ensure that the U.S. Department of Education (ED) remains compliant with court orders and borrowers' wishes when applying for borrower defense.

Nevertheless, FSA identified borrowers that opted into forbearance/ stopped collection activity that do not appear to be in the aforementioned forbearance status. To assist in complying with the new CR, especially as it relates to applications submitted under the legacy process and helping FSA comply with ED's court orders as to ED's borrower defense process, FSA already sent servicers a notice of borrowers for who opted into forbearance or stopped collection activity, but for whom FSA could not confirm that the borrowers are in the proper status. If a borrower, who otherwise should have been in forbearance, made a payment due to a lapse in forbearance or in stopped collection activity status, we are asking servicers to refund that payment to the payer. While FSA's initial notice focused on borrowers that are subject to an existing court order, FSA may need to send the servicers additional notices to ensure that borrowers' forbearance and payment elections are respected. If FSA anticipates needing to perform mass updates similar to this in the future, FSA will provide advance notice when possible and streamline the mass update process into the platform to ease the burden on servicer resources.

For the impacted borrowers, each servicer's responsibility is:

- To apply a non-capping administrative forbearance to any borrowers covered by the CR in order to cover or resolve any prior delinquency and to bring the borrower current.
- To keep the borrower on forbearance until FSA instructs servicer to remove the forbearance.
- If the borrower is currently in deferment or in $0.00 IDR plan, to keep the borrower in that deferment or plan. If that deferment or plan ends prior to FSA instructing servicer to remove the forbearance, the servicer must apply an administrative forbearance after the deferment/plan ends so the borrower remains in forbearance until FSA instruct servicer to remove the forbearance.
- If applicable and consistent with the above, to refund payments that the borrower made due to forbearance or stopped collection lapse.
- The borrower may continue to make voluntary payments if desired; these payments do not need to be refunded to the borrower. FSA respects a borrower's right to continue to make voluntary payments while an application for borrower defense is pending.

FSA appreciate your efforts and diligence in ensuring servicers continue to fulfill the requirements related to borrower defense applications and help ED comply any relevant court orders.

Sincerely,

Borrower Defense Team



# EXHIBIT "C"

**U.S. Department of Education**

**Office of Federal Student Aid**

**Sixth Monthly Compliance Report in response to ECF 130, *Manriquez et al. v. DeVos*, Case No. 17-cv-07210-SK, U.S. District Court for the Northern District of California**

**April 1, 2020**

# Introduction and Summary

Pursuant to the Court's Order of October 24, 2019, ECF No. 130, the U.S. Department of Education (the "Department") through its Federal Student Aid office ("FSA") submits its sixth monthly status report regarding its attempts to comply with the preliminary injunction in this case, *see* ECF No. 60.  That injunction, as amended on June 19, 2018, ECF No. 70, and clarified on August 30, 2018, ECF No. 89, prevents the Department from collecting relevant student loan debts from members of the class that has been certified in this case.[1] *See also* Order Granting Mot. for Class Cert., ECF No. 96.

On December 16, 2019, the Department completed the remediation of all known impacts to potential class members that had been identified in prior reports to this Court. Further, the Department is maintaining substantial compliance with the preliminary injunction by immediately placing newly identified potential class members in the appropriate repayment status to stop debt collection and maintaining potential class members in appropriate repayment status on an ongoing basis (e.g., forbearance).

The Department has continued sending borrower defense decision letters to certain borrowers as described in prior reports. To ensure that such borrowers who have been identified as potential class members in previous reports are kept in forbearance while federal loan servicers finish processing their adjudicated claims, the Department will continue to include these borrowers on the first tab of the attached spreadsheet as potential class members until their borrower defense claims are fully closed out and the changes to their federal loans are processed.

---

[1] Because the borrowers covered by the preliminary injunction are co-extensive with the borrowers covered by the order certifying the class in this case, references to class members in this Report refer to borrowers covered by the preliminary injunction.  *See* Order Certifying the Class, ECF No. 96; Amended PI Order ¶¶ A-C.

As in prior reports, this report includes a spreadsheet containing a list of the currently known potential class members, which the Department will separately move to file under seal due to the personally identifying information contained therein. For each potential class member, the spreadsheet includes information the Court has requested about the Department's attempts to comply with the preliminary injunction. Throughout the spreadsheet, "1" is used to answer "Yes," and "0" is used to answer "No." The spreadsheet contains three sections. The first section (consisting of the first 1,138 pages with the footer "Class_M_Mar") lists each potential class member and then provides answers for the Court's first, second, and seventh questions. The second section (consisting of the next 354 pages with the footer "Impacted_Mar") lists the subset of potential class members who were impacted by the Department's non-compliance. For these impacted borrowers, the spreadsheet provides answers to the Court's third, fourth, fifth, and sixth questions. Finally, the third section (the final page) contains an index of shorthand terms and abbreviations used throughout the spreadsheet.

The Department continues to take every reasonable effort to ensure compliance with the Court's injunction, including an ongoing process of monitoring and verifying borrower defense applications.

1. **Defendants' progress toward identifying which of the 74,781 potential class members are class members**

The potential class currently consists of 75,520 borrowers, a net decrease of 4,567 borrowers from the number (80,087) reported in the March 2, 2020 Compliance Report. This change reflects the addition of 633 borrowers to the class and the removal of 5,200 borrowers from the class. The additions to the potential class were the result of new borrower defense claims received by FSA, newly opened cases that were previously incomplete (e.g., claims

3

initiated by borrowers, but not fully documented with supporting information or evidence), borrowers with only FFEL loans who recently consolidated into Direct Loans, and FSA's ongoing data validation and verification efforts. On the other hand, contributing factors for the net decrease include incomplete borrower defense applications, borrowers with no federal loans left to discharge, and duplicate applications. As expected, the number of potential class members will continue to be dynamic as new borrowers apply, validation and verification continues, and notification of claims adjudications are processed and released.

Of the 75,520 potential class members listed in the attachment, FSA has determined that 48,997 borrowers are confirmed class members (e.g., submitted a successful JPR claim against a CCI school and have outstanding Direct Loans). These confirmed class members are identified in the first section of the spreadsheet and fall into two categories. The first category consists of borrowers who asserted Corinthian JPR claims that the Department adjudicated and awarded partial relief under the 2017 borrower defense relief methodology prior to the court's injunction (approximately 15,000 borrowers). The second category consists of borrowers who asserted Corinthian JPR claims that the Department has reviewed since the 2017 methodology was enjoined and has determined are eligible for relief (approximately 34,000 borrowers). Before the Department applies the new methodology announced on December 10, 2019, to issue final decisions awarding partial relief to any confirmed class member, it would seek relief from the Court from the preliminary injunction to do so, consistent with the Court's orders. The first section of the spreadsheet also identifies borrowers who are no longer potential class members because they no longer have pending borrower defense claims that potentially meet the criteria, including borrowers who have been adjudicated for 100% relief (451 borrowers) and borrowers whose Corinthian JPR application has been determined ineligible because they did not attend the

right program, did not attend during the right time period, or otherwise did not successfully fill out their application form (900 borrowers). As previously noted, FSA will keep borrowers on the list of potential class members on tab 1 until their borrower defense claims have been fully processed by the servicers and their cases closed.

Finally, FSA will continue to review applications and appropriately notify borrowers of the outcomes of their applications. To that end, FSA expects to notify approximately 16,000 borrowers of their ineligibility for borrower defense relief over the course the next several weeks. These efforts, paired with ongoing validation and verification, will permit FSA to continue confirming status for the remaining 25,172 potential class members.

## 2. The repayment status of each potential and confirmed class member

As stated in prior reports, the Department continues to maintain all identified potential class members in forbearance, stopped collections or a similar repayment status, unless a particular borrower has proactively opted out of that status.

The first section of the spreadsheet attachment provides the repayment status of each potential class member. For each potential class member not in forbearance or stopped collection status, the spreadsheet indicates the reason why, such as being in an alternative status that is similar to forbearance (e.g., a $0/month income-driven repayment plan or in-school deferment status). The abbreviations and shorthand terms used on this portion of the spreadsheet are defined in the third section of that spreadsheet.

## 3. Whether each potential and confirmed class member was erroneously taken out of forbearance or stopped collections status and whether the correct status has been restored

FSA has continued its efforts to reduce the overcounting of impacts to potential class members. In last month's report, FSA removed those borrowers from the impacted lists whose only impacts occurred prior to the date they filed their BD application. In this month's report, FSA has also factored in a reasonable amount of processing time to account for the time that it takes the borrower's loan servicer to initiate applicable borrower defense protections (i.e., place the borrower into forbearance or stopped collections). For example, the contracts FSA has with its non-default servicers require those servicers to process all borrower defense related forbearance requests within five (5) business days of receiving the request in the borrower defense system of record (CEMS). To account for this processing time, impacts that occurred five or fewer days after a borrower submitted a borrower defense application have been removed from this report. For defaulted borrowers, it can take FSA's loan servicer approximately three weeks to effectively cease involuntary collection efforts (e.g, wage garnishment or tax offset). The default servicer also has 5 business days to apply a "stop collections" tag to the borrower's accounts once they have been notified by the BD system of record. However, the default servicer must then notify the borrower's employer and/or the Department of the Treasury to cease the involuntary collections. Those stopped collection notifications are then transmitted in batches on a weekly basis to employers and Treasury. While Treasury acts immediately on these notifications, it can take the employers a couple of weeks to fully process and cease collection activity. Thus, FSA has started to remove involuntary collections that occurred 21 days or fewer after a borrower submitted a borrower defense application from the report. This process remains ongoing and will continue in future reports.

FSA is continuing the process of confirming which borrowers in the impacted categories experienced debt collection activities caused by noncompliance with the injunction and

identifying and removing those borrowers who only experienced debt collection activities unrelated to noncompliance with the injunction.

All 34,697 borrowers whom FSA has identified at some point as having been erroneously taken out of forbearance or stopped collections status are currently in the correct repayment status. This total number of impacted borrowers represents a net decrease of 3,116 borrowers since the March Report.

The main contributing factor to the decrease in the number affected borrowers is, as mentioned above, that FSA is reducing the overcounting of impacts that occurred before a borrower became subject to the Court's injunction.

For each potential class member impacted by the Department's non-compliance, the second section of the spreadsheet attachment indicates whether the borrower was in an erroneous payment status and whether the status has been corrected.

**4.    Whether each potential and confirmed class member made a payment or multiple payments due to Defendants' negligence, and whether refunds have been issued**

FSA has initiated refunds to all identified borrowers who made one or more voluntary payments and who would not potentially be harmed by a refund.  FSA has identified 12,211 borrowers who made one or more voluntary payments, a net decrease of 777 borrowers since the March Report. Again, the main contributing factor to the decrease in the number of affected borrowers is that FSA is reducing the overcounting of impacts that occurred before a borrower became subject to the Court's injunction.

As discussed in prior compliance Reports, the Department did not request that the U.S. Department of the Treasury process refunds for some of the potential class members identified at that time as having made voluntary payments because these borrowers appear to have made

payments for reasons unrelated to the incorrect payment due notices they were sent, and so refunding these borrowers would lead to unintended consequences and potential financial harm. (*See* Nov. Report at 6-7 and Dec. Report at 10.)

Additionally, FSA has identified 1,777 borrowers who may have been issued refunds for payments they made prior to the December Report, but who are still voluntarily making payments on their student loans. In light of these borrowers' decision to continue making payments, FSA has categorized those borrowers on the spreadsheet as "Borrower has submitted additional payments."

For each potential class member impacted by the Department's non-compliance, the second section of the spreadsheet attachment indicates whether the borrower made one or more payments and refunds have been issued.

5. **Whether each potential and confirmed class member was erroneously subjected to wage garnishment or tax offset due to the Defendants' negligence, and whether refunds have been issued**

FSA has initiated refunds for all involuntary payments made by the 1,103 borrowers it has identified as having been subjected to wage garnishment or tax offsets, a net decrease of 28 borrowers since the March Report. Again, the main contributing factor to the decrease in the number of affected borrowers is that FSA is reducing the overcounting impacts that occurred before a borrower became subject to the Court's injunction.

As mentioned in prior Reports, through FSA's ongoing verification and validation efforts, the Department has identified 25 borrowers whose employers had ignored stop collection orders from the Department and continued to garnish the borrowers' wages (a net decrease of 24 borrowers from last month). FSA has verified these borrowers were in the proper repayment

status at the time the involuntary payments were received and FSA has initiated refunds for all of those payments.

Since the employer is actually the one that garnishes wages, the Department does not have the capability to prevent employers from continuing to garnish wages following a stopped collection order. FSA has taken additional steps to continue to reiterate the Department's stopped collection order to these borrowers' employers and have initiated enhanced contact protocols to continue informing these employers into the future (e.g., multiple attempts to contact the employers via email and phone).

Additionally, as part of FSA's ongoing validation and verification process FSA has identified a handful of confirmed or potential class members who were inadvertently subject to offset this past month (8 borrowers). Two of those borrowers had submitted multiple BD applications and in each case FSA had notified the borrower that one of their applications was ineligible for borrower defense relief. Consequently, their loan servicer mistakenly removed the borrowers from a stopped collection status and they were subject to tax offset.

The remaining six borrowers were mistakenly subject to offset due to servicer coding error. Specifically, those borrowers had originally paid off their loans in full (based in part on an offset collection) and therefore were not coded as being in a stopped collection status. Two months ago, unrelated to its efforts to comply with the Court's injunction, FSA instructed the servicers to refund all involuntary payments made by borrower defense applicants after they submitted their application but before the Court entered its injunction.  When these particular borrowers then received a refund, they were left with a balance on their loan. Since they were never coded as being in stopped collections, later that month they were inadvertently subjected to offset.

Refunds have been issued to 7 of these borrowers, and the loan servicer is in the process of refunding the last borrower.  All of these borrowers have been placed back into a stopped collections status.

For each potential class member impacted by the Department's non-compliance, the second section of the spreadsheet attachment indicates whether the borrower was erroneously subject to wage garnishment or tax offset and refunds have been issued.

6.   **Whether each potential and confirmed class member was subject to adverse credit reporting due to Defendants' negligence, and whether each false credit report has been corrected**

FSA has completed correction to the credit reports for all 4,336 borrowers who FSA has identified as having been subject to adverse credit reporting.  That number is a net decrease of 332 borrowers since the March Report. Again, the main contributing factor to the decrease in the number of affected borrowers is that FSA is reducing the overcounting of impacts that occurred before a borrower became subject to the Court's injunction.

For each potential class member impacted by the Department's non-compliance, the second section of the spreadsheet attachment indicates whether the borrower was subject to adverse credit reporting and each false credit report has been corrected.

7.   **Whether each potential and confirmed class member has received the revised notice of Defendants' noncompliance, to be approved by the Court**

FSA completed distribution of the court-approved notice to the members of the class as of December 31, 2019.  In order to prevent any borrower confusion, FSA did not send class notifications to those borrowers who received separate notice of claim adjudication on December

11, 2019, and therefore did not have pending borrower defense applications at the time the revised notices were sent.

For each potential and confirmed class member, the first section of the spreadsheet attachment indicates whether the borrower was sent the revised notice.

**8.     Whether Defendants have established a hotline and webpage specifically for Corinthian borrowers**

The Department's communications team has revised the StudentAid.gov website to include prominently placed links regarding this case on the website's home page (specifically in its "Announcement" and "Popular Topic" sections.)[2]  Additionally, highlighted and simplified language has been included on the linked webpage[3] within the website.  As previously reported, these improvements were made on October 21, 2019. The communications team will continue to improve the website's content regarding this case and for Corinthian borrowers.

Additionally, the Department's communication team has improved the existing borrower defense telephone hotline at 1-855-279-6207, to include a targeted greeting, a dedicated menu option regarding the this case, and current targeted information for customer service representatives to answer general questions regarding this litigation, as well as the adjudication and litigation class member notifications disseminated in December.

**9.     Any other information relevant to the Defendants' compliance with the preliminary injunction**

---

[2] https://studentaid.gov/

[3] https://studentaid.gov/announcements-events/corinthian#preliminary-injunction

As mentioned in the December report, FSA's Chief Operating Officer is now requiring monthly certifications from the federal loan servicers at the vice president level or above for all data being sent from the servicers to facilitate the Department's ongoing borrower defense data validation and remediation efforts. The servicers have been complying with this requirement.

The Department remains not only focused on remediating any harm to any and all borrowers that have been affected, but also on making strategic improvements to our operational program management and loan servicing oversight, control, and communication frameworks. The Department will continue its exhaustive efforts to verify, validate, and report on progress to ensure compliance with the terms of the Court's order and reestablish the trust and confidence of our borrowers and the public.