**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAIMARIA BODOR, | : | CIVIL ACTION |
| Individually and on behalf of all | : | |
| others similarly situated, | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | NO. 19-cv-5787(JMG) |
| | : | PUBLIC VERSION FILED |
| MAXIMUS FEDERAL SERVICES, INC., | : | DECEMBER 6, 2021 |
| | : | |
| Defendant. | : | |

**DEFENDANT MAXIMUS FEDERAL SERVICES, INC.'S
MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S INDIVIDUAL CLAIMS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule of Civil Procedure 7.1, Defendant Maximus Federal Services, Inc. ("Maximus Federal") hereby moves this Honorable Court for an Order granting summary judgment in its favor and against Plaintiff Jaimaria Bodor ("Plaintiff"), as to Plaintiff's individual claims asserted in her Amended Class Action Complaint.

For the reasons set forth in the accompanying Memorandum of Law (incorporated herein as if set forth in full), Maximus Federal's Motion for Summary Judgment should be granted and an Order dismissing (1) Plaintiff's individual claims with prejudice; and (2) Plaintiff's Amended Complaint without prejudice should be entered in the form attached hereto.

Respectfully submitted,

**SAUL EWING ARNSTEIN & LEHR LLP**

*/s/ Marisa Rachel De Feo*
Marisa Rachel De Feo
Ryan L. DiClemente
SAUL EWING ARNSTEIN & LEHR LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
(Tel) 215-972-1976
Marisa.DeFeo@saul.com
Ryan.DiClemente@saul.com
*Attorneys for Defendant*

Dated:  January 29, 2021

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAIMARIA BODOR, | : | CIVIL ACTION |
| Individually and on behalf of all | : | |
| others similarly situated, | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | NO. 19-cv-5787(JMG) |
| | : | |
| MAXIMUS FEDERAL SERVICES, INC., | : | |
| | : | |
| Defendant. | : | |

## **O R D E R**

**AND NOW,** this _____ day of _____, 2021, upon consideration of Defendant Maximus Federal Services, Inc.'s Motion for Summary Judgment as to Plaintiff's Individual Claims, and any opposition thereto, it is hereby **ORDERED** that Defendant's Motion is **GRANTED**. Final judgment is **HEREBY ENTERED** in favor of Defendant Maximus Federal Services, Inc. and against Plaintiff Jaimaria Bodor ("Plaintiff") as to Plaintiff's individual claims, and those claims are **DISMISSED WITH PREJUDICE**. The Amended Class Action Complaint in this action is **DISMISSED WITHOUT PREJUDICE**, and the Clerk of Court shall mark the case closed.

BY THE COURT:

_____
The Honorable John M. Gallagher, U.S.D.J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAIMARIA BODOR, | : | CIVIL ACTION |
| Individually and on behalf of all | : | |
| others similarly situated, | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | NO. 19-cv-5787(JMG) |
| | : | |
| MAXIMUS FEDERAL SERVICES, INC., | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT MAXIMUS FEDERAL SERVICES, INC.'S
<u>MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S INDIVIDUAL CLAIMS</u>**

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT .................................................6

II.   STATEMENT OF MATERIAL FACTS................................................................................7
    A.    FSA's Contract with Maximus Federal ................................................................7
    B.    The Treasury Offset Process and BD Applications Generally ............................8
    C.    The DMCS System Maintains Procedures to  Stop Collection Activities..............9
        1.    Events Leading to Plaintiff's BD Application ...........................................11
        2.    Plaintiff's Federal Student Loans and BD Application ...........................12
        3.    Plaintiff's 2018 tax refund is subsequently provided to her by
            Treasury ....................................................................................................14
        4.    FSA's subsequent communications regarding the Manriquez
            Litigation and Maximus Federal's performance under the Contract .........15

III.  PROCEDURAL HISTORY..................................................................................................16

IV.   ARGUMENT ........................................................................................................................16
    A.    Summary Judgment Standard. .............................................................................16
    B.    Maximus Federal Is Entitled To Summary Judgment .......................................17
        1.    Plaintiff Lacks Article III Standing...........................................................17
        2.    Maximus Federal is Entitled to the Dismissal of Plaintiff's FDCPA
            Claims .......................................................................................................19
    C.    Maximus Federal did not Engage in any "Collection Activity"..........................19
    D.    There is No Evidence that Maximus Violated §1692e ........................................21
    E.    There is no Evidence that Maximus Violated §1692f ..........................................23
    F.    Maximus Federal is Shielded from Liability by the "Bona Fide Error"
        Defense ................................................................................................................25
            i.    The Withholding of Plaintiff's Tax Refund was
               Unintentional...............................................................................25
            ii.   The Withholding of Plaintiff's Tax Refund was a Bona
               Fide Error.....................................................................................27
            iii.  The Relevant Procedures were Reasonably Designed to
               Prevent the Error .........................................................................28
    G.    Maximus Federal Is Entitled To Contractor Immunity.........................................31

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Agostino v. Quest Diagnostics, Inc.*, No. CIV.A. 04–4362 SRC, 2011 WL 5410667 (D.N.J. Nov. 3, 2011) ...........................................................................................................6, 34

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .............................................6, 23

*Arias v. Gutman, Mintz, Baker, & Sonnenfeldt LLP*, 875 F.3d 128 (2d Cir. 2017).....................6, 7

*Balon v. Enhanced Recovery Co., Inc.*, 316 F.R.D. 96 (M.D. Pa. 2016)....................................7, 34

*Beaver Valley Power Co. v. Nat'l Eng'g & Contracting Co.*, 883 F.2d 1210 (3d Cir. 1989)...7, 38

*Becker v. Skype Inc.*, C.A. No. 12-06477, 2014 WL 556697 (N.D. Cal. Feb. 10, 2014) ..........7, 25

*Brown v. Card Serv. Ctr.*, 464 F.3d 450 (3d Cir. 2006) ...........................................................7

*Butters v. Vance Int'l, Inc.*, 225 F.3d 462 (4th Cir. 2000) ........................................................7, 38

*Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016) ............................................................7, 38

*Carley v. Wheeled Coach*, 991 F.2d 1117 (3d Cir. 1993)........................................................7, 38

*Costello v. Unite H.E.R.E.I.U. Loc. 54*, No. 09-5098, 2010 WL 1877466 (E.D. Pa. May 10, 2010) ................................................................................................................7, 23

*Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640 (4th Cir. 2018)................7, 38, 39

*Daubert v. NRA Grp., LLC*, 861 F.3d 382 (3d Cir. 2017) ........................................................7, 32

*Demmick v. Cellco P'ship*, C.A. No. 06-2163, 2007 WL 789040 (D.N.J. Mar. 13, 2007) .......7, 25

*DiNaples v. MRS BPO, LLC*, 934 F.3d 275 (3d Cir. 2019)........................................................8, 24

*Douglass v. Convergent Outsourcing*, 765 F.3d 299 (3d Cir. 2014) ..................................8, 26, 30

*Epstein v. JPMorgan Chase & Co.*, C.A. No. 13-4744, 2014 WL 1133567 (S.D.N.Y. Mar. 21, 2014) ................................................................................................................8, 25

*Fireman's Ins. Co. of Newark, N. J. v. DuFresne*, 676 F.2d 965 (3d Cir. 1982)............................8

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000).............8, 24

*Gebhardt v. LJ Ross Assocs., Inc.*, C.A. No. 15-2154, 2017 WL 2562106 (D.N.J. June 12, 2017) ................................................................................................................8, 36

*Glover v. FDIC*, 698 F.3d 139 (3d Cir. 2012) .......................................................................8, 36

*Good v. Nationwide Credit, Inc.*, 55 F. Supp. 3d 742 (E.D. Pa. 2014)......................................8, 28

*Hoover v. Monarch Recovery Mgmt., Inc.*, 888 F.Supp.2d. 589 (E.D. Pa. 2012) ..........................8

*Howard v. LVNV Funding, LLC*, No. 3:19-CV-93, 2020 WL 978653 (W.D. Pa. Feb. 28, 2020) .8, 30

*Hyman v. Tate*, 362 F.3d 965 (7th Cir. 2004) ...................................................................8, 33, 36

*In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326 (4th Cir. 2014) ......................................................9

*Jensen v. Pressler & Pressler*, 791 F.3d 413 (3d Cir. 2015) ....................................................9, 28

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 130 S. Ct. 1605 (2010) ......................................................................................................................................9, 36

*Johnson v. Riddle*, 443 F. 3d 723 (10th Cir. 2006)..................................................................9, 32

*Kamal v. J. Crew Grp., Inc.*, 918 F.3d 102 (3d Cir. 2019) .................................................9, 24, 25

*Katz v. Asset Acceptance, LLC*, C.A. No. 05-2783, 2006 WL 3483921 (E.D.N.Y. Nov. 30, 2006) ......................................................................................................................................9, 36

*Koutsoubos v. Boeing Vertol, Div. of Boeing Co.*, 553 F. Supp. 340 (E.D. Pa. 1982) .............9, 38

*Kromelbein v. Envision Payment Sols., Inc.*, 2013 WL 3947109 (M.D. Pa. Aug. 1, 2013)......9, 30

*Kropelnicki v. Siegel*, 290 F.3d 118 (2d Cir. 2002) ....................................................................29

*Lesher v. Law Offices of Mitchell N. Kay, PC*, 650 F.3d 993 (3d Cir. 2011) .................................9

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .........................................................9, 24, 25

*Mammen v. Bronson & Migliaccio, LLP*, 715 F. Supp. 2d 1210 (M.D. Fla. 2009) .....................10

*McLaughlin v. Phelan Hallinan & Schmieg, LLP*, 756 F.3d 240 (3d Cir. 2014) ...................10, 26

*Mendoza v. Diversified Consultants, Inc.*, No. 18-2005, 2019 WL 2524117 (E.D. Pa. June 18, 2019) ....................................................................................................................................10, 28

*Negash v. Devry University, et al.*, 2017 WL 4277085 (E.D. Mich. May 12, 2017) ........10, 27, 31

*Nichole Med. Equip. & Supply, Inc. v. TriCenturion, Inc.*, 694 F.3d 340 (3d Cir. 2012) .......10, 39

*O'Rourke v. Palisades Acquisition XVI, LLC*, 635 F.3d 938 (7th Cir. 2011)...............................29

*Rathblott v. PeopleStrategy, Inc.*, 685 F. App'x 107 (3d Cir. 2017) ............................................40

*Regan v. Law Offices of Edwin A. Abrahamsen & Assocs., P.C.*, C.A. No. 8-5923, 2009 WL 4396299 (E.D. Pa. Dec. 1, 2009) .................................................................10, 32

*Richland-Lexington Airport Dist. v. Atlas Properties, Inc.*, 854 F. Supp. 400 (D.S.C. 1994) 10, 39

*Rush v. Portfolio Recovery Associates*, 977 F. Supp. 2d 414 (D.N.J. 2013) ...........................10, 34

*Smith v. Transworld Sys., Inc.*, 953 F.2d 1025 (6th Cir. 1992) ..............................................10, 33

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) .......................................................................10

*Stanford v. Home Depot USA, Inc.*, 358 F. App'x 816 (9th Cir. 2009)....................................10, 25

*Vangjeli v. Banks*, No. CV 19-1635, 2020 WL 5880131 (E.D. Pa. Oct. 2, 2020).......................11

*Volden v. Innovative Fin. Sys., Inc.*, 440 F.3d 947 (8th Cir. 2006) ..........................................11, 29

*Washington v. Convergent Outsourcing, Inc.*, 2017 WL 1093152 (N.D. Ill. Mar. 23, 2017).11, 34

*West v. Abendroth & Russell Law Firm*, 45 F. Supp. 3d 959 (N.D. Iowa 2014)....................11, 33

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ........................................................................11, 24

*Wilhelm v. Credico, Inc.*, 519 F.3d 416 (8th Cir. 2008) ........................................................11, 36

*Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940) .................................................11, 38

**FEDERAL STATUTES**

31 C.F.R. § 285.5 ................................................................................................................. passim

34 C.F.R. § 685.206(c)...........................................................................................................12, 15

34 C.F.R. § 685.222 ...............................................................................................................12, 31

48 CFR § 42.501 ...........................................................................................................................41

15 U.S.C. § 1692e ................................................................................................................ passim

15 U.S.C. § 1692f ................................................................................................................ passim

15 U.S.C. § 1692k(c) .......................................................................................................11, 32, 36

Fair Debt Collection Practices Act ...................................................................................... passim

Fed. R. Civ. P. 56(a) ............................................................................................................1, 23

Title IV, Part D of the Higher Education Act of 1965..................................................................3

## I.    <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Plaintiff Jaimaria Bodor's ("Plaintiff") claims against Defendant Maximus Federal Services, Inc. ("Maximus Federal") are premised entirely on the allegation that Maximus Federal ignores the "automatic stay" and fails to cease "collection activity" after a borrower has submitted a "Borrower Defense to Repayment" Application ("BD Application") to the Department of Education's Office of Federal Student Aid ("FSA"). Plaintiff contends that this action or inaction led the Department of Treasury (the "Treasury") to offset Plaintiff's 2018 tax refund in violation of certain federal regulations and instructions provided to Maximus Federal. This serves as the sole basis for her alleged violations of the Fair Debt Collection Practices Act ("FDCPA"). However, after months of discovery, this foundational allegation has been proven to be wholly inaccurate and unsupported.

*First*, Plaintiff admits that her tax refund in the amount of $79.00 was eventually provided to her by Treasury months before ever filing this Action and without making a single request for its return. In fact, this payment was made as part of the relief afforded to her through an entirely separate class action in the Central District of California. These undisputed facts prevent Plaintiff from the demonstrating the necessary standing to pursue her claims against Maximus Federal.

*Second*, the record confirms that Maximus Federal did not engage in any "collection activity" under the FDCPA. Rather, the "collection activity" (i.e. the withholding of Plaintiff's 2018 tax refund) was required pursuant to the express statutory authority granted to Treasury. Maximus Federal's role was to apply certain approved electronic tags to a borrower's account in FSA's Debt Management and Collection System (the "DMCS system"), which are designed to actually stop, not initiate, third-party "collection activity."

*Third*, contrary to Plaintiff's foundational allegation, FSA's DMCS system, which is operated and maintained by Maximus Federal with the supervision of FSA, has robust procedures

to prevent any third-party collection activity from occurring. In Plaintiff's case, the requisite electronic tag was placed on her account, leading to the cessation of all third-party collection activity since April 2019. However, just four (4) days before the application of this electronic tag, Treasury offset her 2018 tax refund. While there was a brief delay in the application of the electronic tag to Plaintiff's account, the undisputed evidence shows that this delay was caused by a confluence of events having nothing to do with Maximus Federal. These facts preclude Plaintiff from establishing her individual FDCPA claims and fall squarely within the Bona Fide Error defense.

*Finally*, the evidence demonstrates that Maximus Federal was a government contractor who, at all times, was acting pursuant to its contract and at the direction of FSA. Thus, Plaintiff's claims are barred by the long-standing immunity afforded to government contractors. For these reasons, set forth herein, Maximus Federal is entitled to summary judgment and the complete dismissal of Plaintiff's fatally flawed claims.

## II.     STATEMENT OF MATERIAL FACTS

### A.     FSA's Contract with Maximus Federal

On September 30, 2013, FSA entered into a contract with Maximus Federal to, among other things, "operate, maintain and continue development of FSA's portfolio management system," the "DMCS system." (Contract No. ED-FSA-13-C-0021, the "Contract"). [JA-380-431]. The DMCS system is FSA's portfolio management database that is used to service FSA's portfolio of defaulted student loans.[1] [JA-384]. Maximus Federal works at the direction and supervision of

---

[1] Pursuant to the Contract, Maximus Federal also provides technical resources to keep the DMCS system working efficiently and effectively, and also staffs and operates FSA's inbound call centers, its intake facility for correspondence, and its correspondence unit for composing custom written responses to certain inquiries. [JA-384-385].

FSA and pursuant to the 3,000 requirements set forth in the Contract. [Id.; JA-775-781]. Maximus Federal has little to no discretion to operate under the terms of the Contract and nearly every action taken under the Contract is reviewed and approved by FSA. [JA-968:12-21]. Maximus Federal and FSA are in constant communication regarding fulfillment of the 3,000 requirements, including at weekly, bi-weekly, and monthly meetings. [JA-963:1-9; JA-883:1-4; JA-891:21-892:4].

**B.      The Treasury Offset Process and BD Applications Generally**

Congress requires federal agencies to refer delinquent nontax debt, such as defaulted student loan debt,  to Treasury for collection, including through administrative offset. 31 U.S.C. §§ 3716(c)(6), 3720A; 31 C.F.R. §§ 285.5(c), (d). Pursuant to this authority, Treasury operates a centralized Treasury Offset Program ("TOP"), see 31 C.F.R. § 285.5(a)(1), which offsets payments, such as tax refunds, that are intended to be made to a delinquent student loan borrower and applies those payments to the delinquent debts held by FSA.  See 31 C.F.R. §§ 285.5(b), 285.5(c)(2), 285.2(b).  Where a tax refund is offset, Treasury sends a notification to the borrower indicating that his or her student loan has been offset and identifying the "creditor agency" to whom the debt is owed.  *Id.*  Once a borrower's account is certified for TOP offsets within the DMCS system, it does not need to be "recertified" and TOP offsets will continue each year until the delinquent debt is paid in full or removed from the TOP process.  [JA-922:1-12; JA-923:16-924:19].

In certain instances, FSA permits a borrower to raise defenses to the repayment of his or her Direct Student Loans owed to FSA where a school engages in conduct that would give rise to a cause of action against it under applicable state law.  This is commonly known as a "borrower defense" or "BD" claim.  Borrowers wishing to avail themselves of these protections are required to submit BD applications to FSA.  See 34 C.F.R. § 685.206(c).  Thereafter, the "Secretary" is to

cease collection activity on a borrower's Direct Student Loans, unless a borrower has opted out.
Id.

### C.    The DMCS System Maintains Procedures to  Stop Collection Activities

The DMCS system includes robust procedures to prevent collection activity upon receiving notice of a borrower's BD application. [JA-985:18-986:15].   Prior to April 2018, this process included the application of an electronic tag on a borrower's account ("BD Received Tag") that would among, other things, prevent the account from being subject to certain third-party collection activities.  [JA-681-692].  The application of the relevant tags in the DMCS system was applied automatically through a Mass File Update supplied by FSA.  [Id.].

On April 9, 2018, FSA submitted a Change Request to the Contract ("CR 4619") which sought to modify the process by which these BD Received Tags were applied to a borrower's account in the DMCS System.[2]  [JA-338-346].  CR 4619 modified the process to require Maximus Federal to manually apply BD Received Tags to a borrower's account, after receiving an email from FSA with the requisite BD application information.  [JA-687-688]. CR 4619 explained that borrowers who submit BD Applications need collection activity stopped on their loans in DMCS while their BD applications are reviewed by FSA.  [Id.].  This was accomplished through the BD Received Tags in the DMCS system.  [Id.].

These tags were used to prevent the DMCS system from, among other things, referring an account to a private collection agency ("PCAs") or to Treasury for a TOP offset.[3]  [JA-338-346;

---

[2] A "CR" is a formal request from FSA to change or modify a portion of the Contract.  [JA-855:5-7].  Upon receipt of a CR, Maximus Federal conducts an impact analysis and submits a proposal in response to FSA's CR.  [JA-985:17-24]. These proposals are ultimately approved by FSA and memorialized in the form of a final CR. [JA-1022:13-1023:1].

[3] FSA also maintains separate contracts with PCA's to undertake certain collection activity on a borrower's account.  [JA-1016:3-13].

JA-755-774; JA-978:8-979:15].  The application of a BD Received Tag results in a weekly automated report being generated by the DMCS system and sent to Treasury.  [JA-999:23-1000:3; JA-911:12-20; JA-709].  No one from Maximus Federal ever communicates with Treasury regarding this process.  [JA-918:3-919:13].

CR 4619 estimated that FSA currently received approximately 50-60 BD applications per day and anticipated that the "volume will remain about the same."  [JA-687].  CR 4619 required Maximus Federal to respond to the FSA's email requests to apply BD Received tags on a borrower's account "within five business days."  [JA-685, 689].  In finalizing CR 4619, Maximus Federal built in an assumption that it would "accommodate the manual processing of 75 – 80 Borrower Defense Claims Stopped for Collections per day." [JA-690].  If Maximus Federal received a volume greater than 75-80 per day, it would assess the impact and collaborate with FSA to resolve the issue as necessary.  [Id.].  FSA approved the Maximus Federal's proposal, along with assumptions, on April 27, 2018.  [Id.;JA-1021:7-23].

On July 31, 2018, FSA sought to further modify the process for applying BD Received Tags in DMCS through CR 4753.  [JA-755-774].  While CR 4753 left in place many of the procedures in CR 4619, including the application of the BD Received Tags in the DMCS system, it modified the manner in which FSA would communicate a BD applications.  [Id.].  Specifically, CR 4753 required Maximus Federal to retrieve, among other things, notification of BD applications through an enhanced electronic system—the Customer Engagement Management System ("CEMS") Partner Portal.[4]  [JA-759].

---

[4] CEMS is operated and maintained by another government contractor, Centure, who receives and processes BD applications, and assigns them through CEMS. [JA-1024:5-1025:11]. Centure was also responsible for maintaining the call center, the relevant website, and responding to borrower inquiries relating to BD applications.  Id.

In addition to the application of these electronic tags, the DMCS system also had a procedure pursuant to CR 4619 and CR 4753 to search for any offsets after the date of the BD application and refund those payments to a borrower.  [JA-713-722; JA-688-89].

Maximus Federal uses the solution user manual ("SUM"), which is reviewed and approved by FSA, as the training resource for the operation of the DMCS system.  [JA-693-749; JA-856:14-24].  Maximus Federal employees are trained on the SUM. [JA-1006:5-1007:6].  Maximus Federal also audits the DMCS' processes, including the BD Received tagging process to ensure it is working appropriately.  [JA-941:1-942:7].

### 1.    Events Leading to Plaintiff's BD Application

In February 2019, FSA and its contractors saw a dramatic increase in the number of BD applications. [JA-1003:2-1004:9; JA-673].  Maximus Federal communicated with FSA regarding the increase in the number of BD applications and the potential reasons for the same.  [JA-581-583].  Beginning in late February 2019, the funding for Maximus Federal to process BD applications pursuant to CR 4619 and CR 4753 began to deplete, eventually leading to a hold imposed by FSA on the processing of BD applications from February 25, 2019 to March 11, 2019. [JA-600].  As a result, a backlog of BD application work accumulated in CEMS, causing Maximus Federal to fall outside the standard 5 business day time period to apply the proper "tags" to the borrower account.  [Id.].  FSA did not give Maximus Federal any indication that volumes would be higher than estimated.[5]  [Id.].

_____

[5] During this same time period, Maximus Federal was also working with FSA to address the impact of FSA's unilateral contract modification ED-FSA-13-C-0021-P000106 ("Modification 106"), which changed the contract terms related to DMCS staff security clearance requirements.  [JA-599-602; JA-1001:9-1002:16].  Modification 106 resulted in security clearance delays for new hires and ultimately limited the resources available to work the backlog. [JA-913:22-915:12].

-11-

Notwithstanding the issues with funding delays, processing holds, and security clearances, Maximus Federal continued to process more than 75-80 applications per day. [JA-29-86; JA-087 -122; JA-953:5-954:2].[6]   In order to keep up with the increased volume, Maximus Federal employees were working overtime (at one point mandatory overtime) and multiple requests for additional employee clearances were made to FSA. [JA-945:22-953:3].   However, Maximus Federal had no additional employees who had the required FSA clearance to work through the excess volume. [Id.].

## 2.    Plaintiff's Federal Student Loans and BD Application

Plaintiff was certified for TOP offsets beginning in 2015 and her prior tax refunds were offset by Treasury to pay her defaulted loans. [JA_825:6-826:12].   Plaintiff's BD application was submitted to FSA on March 14, 2019. [JA-983:1-7].   Plaintiff's BD application was processed by Centure and eventually assigned to Maximus Federal through CEMS on April 1, 2019.   [JA-614-627].   Ms. Bodor's BD application was submitted as part of a Mass File update made to CEMS by FSA on April 1, 2019.   [JA-1026:8-1028:16].   This update significantly increased the number of BD applications submitted through CEMS from 2,365 to 16,360.   [JA-202; JA-814-15; JA-1026:8-1028:16].   Maximus Federal promptly notified FSA of the impact this significant increase of BD applications would have on its ability to process BD applications within the 5 business day time period.   [JA-903:22-905:17].   FSA worked to create a Mass File update that would remove a significant portion of these borrowers from CEMS.   [Id.].   While FSA worked on the Mass File update, Maximus Federal was directed to **"stop work"** on the population of borrowers received in CEMS on April 1, 2019, which included Plaintiff's application.   [JA-906:21-907:9; JA-1027:17-

---

[6] For example, in March 2019, Maximus Federal processed 2,489 applications in the remaining fifteen business days of the month, equaling approximately 120 per day.  [Id.].

1028:5].  As a result, Maximus Federal could not have met the standard 5 business day time period for applying BD Received Tags to the relevant borrowers' accounts, including Plaintiff's account. [Id.].  On April 9, 2019, FSA provided a Mass File update to the DMCS system that removed approximately 14,000 borrowers from CEMS. [JA-1026:8-1028:16; JA-792-93].  However, this left Maximus Federal with more than 2,300 BD Received Tag requests in CEMS, including Plaintiff's BD Received Tag.[7]  [JA-1026:8-1028:16].  Maximus Federal continued to work through the backlog of remaining BD applications in CEMS with the oldest BD Received Tags being worked first.  [JA-903:22-905:17; JA-699-700].  Thus, Maximus Federal could not have been aware of Plaintiff's BD application until it had an opportunity to review her account in CEMS and apply the appropriate tags in the DMCS system.  [Id.].

On April 29, 2019, a BD Received Tag was properly applied to Plaintiff's account in DMCS – a delay of only fifteen business days.  [JA-936:7-937:9].  On May 3, 2019 the BD Received Tag was communicated to Treasury as part of the weekly automated communication from the DMCS system.  [JA-966:3-8].  Bodor's account was inactivated from TOP and recalled from a PCA.[8]  [Id.].  Plaintiff has not been subject to any offsets or collection actions by any third parties since the BD Received Tag was applied to her account.  [JA-18-19].  Unfortunately, just four (4) days before the application of the BD Received Tag, Plaintiff's 2018 tax refund in the amount of $79.00 was offset by Treasury.  [Id.].

---

[7] A simple calculation is telling. The 2,300 borrowers remaining far exceeds Maximus Federal's ability to process 75 to 80 stop collection requests per day within the 5 day time period.  [JA-955:9-20].

[8] Coast Professional, Inc. was the PCA assigned to collect Plaintiff's defaulted Student Loans. [JA_24].

Plaintiff admits that she never had any communications with Maximus Federal in connection with her student loan accounts or her BD application. [JA-7-8.; JA-829:4-6; JA-834; JA-836:14-21].   After Plaintiff's 2018 tax refund was offset, Plaintiff claims she received a communication from Treasury confirming it had offset her 2018 tax refund.  [JA-829:4-830:4; JA-789].

In May 2019, Maximus Federal developed a corrective action plan ("CAP"), which is reviewed and approved by FSA to assist Maximus Federal in working through the continued backlog in the CEMS system.  [JA-599-602].  The CAP identified the "root causes" of the continued CEMS backlog as: (i) the funding delays in February (2/25/2019) which prevented Maximus Federal "from working the items that were being submitted (2/25 – 3/11), thus creating a backlog of work;" (ii) the volume of BD applications which were "higher than historical volumes" and was not communicated to Maximus Federal; and (iii)  the "security clearance issues" described above.[9]    [JA-600-JA-602].  Pursuant to the CAP, FSA authorized such steps as "mandatory overtime" and the utilization of support staff, allowing Maximus Federal to bring the processing of BD applications within the DMCS system to the standard 5 business day period in June 2019.  [JA_944:11-947:2; JA-948:20-25].

### 3.    Plaintiff's 2018 tax refund is subsequently provided to her by Treasury

On October 1, 2019, as a result of a lawsuit filed against FSA in the Central District of California, captioned *Manriquez v. Betsy Devos*, (the "Manriquez lawsuit"), FSA requested that Maximus Federal review certain identified accounts and potentially provide refunds of certain involuntary payments received after a date specified by FSA.  [JA-00026-28].  Plaintiff's account

---

[9] The CAP noted that Maximus Federal had "proactively hired" three additional employees to assist with this effort, but those employees could not be utilized until they received the "lengthy BI process and received system credentials." [JA-600-602; JA-947:3-24].

-14-

was identified by FSA and Maximus Federal initiated the process of refunding her TOP offset at FSA's request through the DMCS system. [JA-938:2-939:25].  Plaintiff admits that the Treasury issued her a payment in the amount of $79.00 in October 2019, representing the full amount of her 2018 tax refund.  [JA-25; JA-836:23-837:5].

4.    **FSA's subsequent communications regarding the Manriquez Litigation and Maximus Federal's performance under the Contract**

As part of the Manriquez litigation, on or about October 9, 2019, Maximus Federal also received a letter from General Mark Brown, Chief Operating Officer of the FSA (the "General Brown Letter").  [JA-628-629].  The General Brown Letter requested that Maximus Federal conduct an analysis of its application of CR 4753 for a certain population of borrowers.  [Id.]. Maximus conducted such analysis and provided two responses to the General Brown Letter.  [JA-584-586; JA-547-551].  Initially in its October 17, 2019 letter, after conducting a preliminary analysis, Maximus Federal identified that it had not been informed of the requirements associated with the orders in the Manriquez Litigation, and therefore, Maximus Federal was unable to work with FSA to ensure that the processing complied with these orders (which differed from CR 4753 process). [JA-878:14-897:1].  Maximus Federal determined that the majority of the allegedly affected borrowers identified on October 1, 2019 and on October 4, 2019 had either been processed correctly, were not assigned from CEMS to Maximus Federal, or were not associated with a Maximus Federal "processing error." [JA-584-586; JA-547-551]. Maximus Federal acknowledged that a small number of the identified accounts were affected by manual processing errors.  [JA-584-586].  Subsequently, after conducting its full analysis, in its October 24, 2019 letter, Maximus Federal provided detailed information regarding the issues it identified.  [JA-547-551]. Specifically, Maximus Federal explained that of the 33,559 relevant borrowers, only 181 of them were missing the relevant electronic tag on their accounts, approximately .4% of the total

-15-

borrowers. [JA-548]. Plaintiff's 2018 tax refund was identified as part of the Manriquez Litigation and this offset was eventually returned to her at the request of the FSA. [JA-939:17-25].

## III.    PROCEDURAL HISTORY

Plaintiff Jaimaria Bodor ("Bodor") commenced this proposed class action against Maximus Federal Services on December 9, 2019 (D.I. 1).[10]  Plaintiff's Complaint alleges that Maximus Federal "routinely ignores" the "automatic stay" associated with the submission of a BD application and fails to "cease collection activity" on the relevant accounts. (D.I. 29 ¶ 1). Plaintiff contends that Maximus Federal has "violated federal regulations and the instructions" from FSA and as a result, has violated the FDCPA. (D.I. 29 ¶¶3-4). Plaintiff contends that Maximus Federal's failure to "rescind its directive to Treasury to offset [Plaintiff's] alleged debt against her tax refund" resulted in the offset of her 2018 tax refund in the amount of $79.00. (D.I. 29 ¶34). Based on these allegations, Plaintiff asserts two cause of action for alleged violations of the FDCPA, one claim under §1692e for Maximus Federal's alleged "false misrepresentations," and another under §1692f, for its allegedly "unfair and/or unconscionable" collection practices. (D.I. 29 ¶¶53, 56-61). Phase 1-A fact discovery has been completed in accordance with the Court's Scheduling Orders and the instant Motion for Summary Judgment is timely filed.

## IV.    ARGUMENT

### A.    Summary Judgment Standard.

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[10] On May 14, 2020 (D.I. 29), Plaintiff filed a First Amended Complaint ("Amended Complaint") against Maximus Federal. Maximus Federal answered Plaintiff's Amended Complaint on June 4, 2020 (D.I. 33). Shortly thereafter, on July 24, 2020 (D.I. 35), this Court's Scheduling Order bifurcated discovery into Phase 1-A for the individual claims and Phase 1-B for class discovery.

56(a).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable

jury could find for the non-moving party, and a fact "material" only if it might affect the outcome

of the suit under governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The

non-moving party cannot "rely merely upon bare assertions, conclusory allegations or suspicions"

to defeat a motion for summary judgment.  Costello v. Unite H.E.R.E.I.U. Loc. 54, No. 09-5098,

2010 WL 1877466, at *3 (E.D. Pa. May 10, 2010) (quoting Fireman's Ins. Co. of Newark, N. J. v.

DuFresne, 676 F.2d 965, 969 (3d Cir. 1982)).

> ### B.     <u>Maximus Federal Is Entitled To Summary Judgment</u>

> #### 1.     **Plaintiff Lacks Article III Standing**

Plaintiff's FDCPA claims against Maximus Federal fail because she has not and cannot

demonstrate she suffered any injury as a result of Maximus Federal's conduct.  Specifically,

Plaintiff admits that her 2018 tax refund, which serves as the sole basis for her FDCPA claims,

was provided to her **months before** the filing this Action.  [JA-25; JA-836:23-837:5]. As set forth

below, this payment alone divests Plaintiff of the requisite standing to maintain her claims.

A plaintiff "seeking to invoke the jurisdiction of the court must establish the requisite

standing to sue." Whitmore v. Arkansas, 495 U.S. 149, 154 (1990); see also Lujan v. Defenders

of Wildlife, 504 U.S. 555, 561 (1992).  To demonstrate the requisite standing to sue, a plaintiff

must suffer "an injury in fact" that is "fairly traceable to the challenged conduct of the defendant."

Kamal v. J. Crew Grp., Inc., 918 F.3d 102, 110 (3d Cir. 2019) (citations omitted).  An "injury in

fact" must be "concrete and particularized" and "not conjectural or hypothetical." Friends of the

Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-181 (2000) (internal citations

omitted).  The injury "must actually exist" and cannot be "abstract." DiNaples v. MRS BPO, LLC,

934 F.3d 275, 279 (3d Cir. 2019) (citing Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1544 (2016).

Here, Plaintiff has not suffered any injury that is concrete and particularized. Instead, Plaintiff's FDCPA claims are based entirely on the allegation that her "tax refund of $79 was withheld" as a result of Maximus Federal's alleged acts.[11]   (D.I. 29 ¶ 34). However, Plaintiff admits (as she must) that she received her $79.00 TOP offset in October 2019 from Treasury, without Plaintiff ever making a single request for its return. [JA-837:22-838:2; JA-25]. The undisputed facts demonstrate that this refund was provided as part of the relief afforded in the Manriquez Litigation. [JA-939:17-25] As a result, Plaintiff does not and cannot adequately demonstrate an injury-in-fact that "actually exists" and is not "abstract."[12] DiNaples, 934 F.3d at 279; see also Lujan, 504 U.S. at 598, n. 4 (1992) ("The existence of federal jurisdiction ordinarily depends on the facts as they exist **when the complaint is filed**.") (emphasis added). Courts have found that refunding the amounts at issue, such as Treasury did here, deprives a plaintiff of the standing to sue.[13]

---

[11] Plaintiff's claims are not based on any communications sent by Maximus, nor could they be because Plaintiff admits that she never had any communications with Maximus. [JA-7-8; JA-829:4-6; JA-834; JA-836:14-21].

[12] Plaintiff is expected to argue that she did not have "use" of the $79.00 prior to its return, but she fails to make any meaningful attempt to quantify this alleged "loss" during discovery and her claim is further undermined by her admission that she never made a single request for this refund. [JA-837:9-838:2]. Courts have rejected similar arguments, such as requests for interest on the refunded amounts, as *de minimus* and/or "abstract." Becker v. Skype Inc., C.A. No. 12-06477, 2014 WL 556697, at *2-3 (N.D. Cal. Feb. 10, 2014). Moreover, when Plaintiff was asked about her damages during her deposition, she stated only that she wanted the "collections to stop," which the record shows occurred after April 29, 2019. [JA-838:3-9].

[13] See Stanford v. Home Depot USA, Inc., 358 F. App'x 816, 818-19 (9th Cir. 2009) (full refund of charge before lawsuit was filed deprived plaintiff of standing to assert claims on behalf of a class); Demmick v. Cellco P'ship, C.A. No. 06-2163, 2007 WL 789040, at *6 (D.N.J. Mar. 13, 2007) (finding plaintiff lacked Article III standing where alleged excess service charges were refunded to plaintiff, even though a portion of the refund was made after plaintiff filed suit); Becker, 2014 WL 556697, at *2-3 (finding plaintiff lacked Article III standing because he received a full refund of an allegedly improperly withheld service renewal fee prior to filing suit and any interest that accrued between the time the fee was withheld and when it was returned by defendant was "too speculative and *de minimums* to convey standing"); Epstein v. JPMorgan Chase & Co.,

Even if Plaintiff could side-step this fatal flaw, the weight of the evidence demonstrates that this "injury" cannot be "fairly traceable" to the conduct of Maximus Federal. <u>Kamal</u>, 918 F.3d at 110. Maximus Federal's role in the TOP process was limited to the application of an electronic tag to Plaintiff's account, which it did, on April 29, 2019, just 4 days after Treasury offset Plaintiff's 2018 tax refund. [JA-936:7-937:9]. This delay in applying the relevant tags was caused by external factors outside of Maximus Federal's control. [JA-600-JA-602]. Thus, even if Plaintiff could demonstrate an injury-in-fact, this "injury" cannot be "fairly traceable" to Maximus Federal. As such, Plaintiff fails to sufficiently establish standing.

### 2. Maximus Federal is Entitled to the Dismissal of Plaintiff's FDCPA Claims

### C. <u>Maximus Federal did not Engage in any "Collection Activity"</u>

Plaintiff's FDCPA claims requires Plaintiff to demonstrate Maximus Federal's alleged misconduct arises from its "collection activity." As described above, the only alleged "activity" on the part of Maximus Federal is the application of an electronic tag to Plaintiff's account within FSA's DMCS system. There is no allegation, nor could there be, that Maximus Federal ultimately offset her 2018 tax refund because this right belongs solely to Treasury. Thus, Plaintiff's FDCPA claims are fatally flawed because there is no evidence of any "collection activity" taken by Maximus Federal.

"To prevail on an FDCPA claim, a plaintiff must prove that (1) she is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a "debt" as the Act defines it, and (4) the defendant has violated a provision of the FDCPA in

---

C.A. No. 13-4744, 2014 WL 1133567, at *7 (S.D.N.Y. Mar. 21, 2014) ("That Plaintiff received the Refund Check demonstrates the absence of any 'actual' injury on which Plaintiff's standing could be established.").

attempting to collect the debt." Douglass v. Convergent Outsourcing, 765 F.3d 299, 303 (3d Cir. 2014). Sections 1692e and 1692f likewise incorporate the requirement that the challenged activity occur in the "collection of 'debt."[14] The FDCPA does not define this phrase, but "debt collection" has been described as "activity undertaken for the general purpose of inducing payment." McLaughlin v. Phelan Hallinan & Schmieg, LLP, 756 F.3d 240, 245-46 (3d Cir. 2014).

Here, Plaintiff's FDCPA claims alleged that Maximus Federal failed to "cease collection activity" **immediately** after receiving her BD application. (DI 29 ¶3). However, this contention fundamentally misstates Maximus Federal's contractual responsibilities and its role in the BD application process. The undisputed facts demonstrate that Plaintiff's 2018 tax refund was offset by Treasury, not Maximus Federal. This conclusion is self-evident because Treasury is **required** by statute to offset these amounts. 31 U.S.C. §§ 3716(c)(6), 3720A; 31 C.F.R. §§ 285.5(c), (d). Courts describing TOP offsets have explained that this right is one that uniquely belongs to Treasury. Negash v. Devry University, et al., 2017 WL 4277085 (E.D. Mich. May 12, 2017) (describing TOP offset process).

Plaintiff admits that she received a notice from Treasury after her 2018 tax refund was offset. [JA-829:14-61:20; JA-789]. This communication was from Treasury, not Maximus Federal, and identifies that it had offset Plaintiff's tax refund on behalf of FSA. [JA-789]. Moreover, the payment of $79.00 that was subsequently provided to Plaintiff in October 2019 came from Treasury, not from Maximus Federal. [JA-25].

Maximus Federal's role in the application of electronic tags in FSA's DMCS system is similarly limited and cannot constitute "collection activity." As described in detail above, FSA,

---

[14] Section 1692e, provides that a debt collector may not use "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e or use "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f.

through CR 4619 provided that Maximus Federal would manually apply these BD Received Tags in FSA's DMCS system after receiving an email from FSA. [JA-681-692]. CR 4619 explained that borrowers who submit BD Applications "need all collection activity stopped on their loans **in the Debt Management and Collections System (DMCS)** while awaiting a disposition on their claims." [JA-684]. This was accomplished through the application of the BD Received Tags which were used to prevent the DMCS system from referring an account to a PCA and from being certified for TOP offsets. [JA-688].

Simply stated, the entire purpose of CR 4619 was to change the process for applying BD Received tags and **to prevent, not initiate,** collection activity through FSA's DMCS system. This action in the DMCS system ultimately led to the stoppage of future "collection activity" **by the PCA's and Treasury**, not from Maximus Federal itself. [JA-688]. Adopting Plaintiff's expansive view of "collection activity" would dramatically broaden the scope of the FDCPA and this Court should resist Plaintiff's expansive view of "collection activity."

### D.    There is No Evidence that Maximus Violated §1692e

Count I of Plaintiff's Complaint is based on her contention that Maximus Federal used "false, deceptive, or misleading representations" in the collection of her student loans. However, Plaintiff's claims are fundamentally flawed because Plaintiff herself admits that Maximus Federal **never communicated** with her. [JA-7-8.; JA-829:4-6; JA-834; JA-836:14-21].

Pursuant to §1692e, "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." Section 1692e is said to be "the provision of the law **dealing with communications from debt collectors to debtors**." Jensen v. Pressler & Pressler, 791 F.3d 413, 417 (3d Cir. 2015).[15] To state a claim under §1692e,

---

[15] "The gist of §1692e is that where some aspect of a debt collector's communication—whether explicit or implied-has the purpose or effect of making a debtor more likely to respond, the FDCPA

a false statement must "ha[ve] the potential to affect the decision-making process of the least sophisticated debtor; in other words, it must be *material* when viewed through the least sophisticated debtor's eyes." Jensen, 791 F.3d at 421. The statutory framework of §1692e, along with the case law described above, contemplates at a minimum, a communication between a debt collector and the consumer.

As set forth above, Plaintiff admits that she never had any communication with Maximus Federal. Instead, she attempts to manufacture a §1692e claim by relying on communications Maximus Federal purportedly had with Treasury regarding her account. However, courts have rejected attempts to rely on third-party communications to support a §1692e claim and this Court should follow "[t]he weight of authority" that applies these claims "in the context of a debt collector making a false, deceptive, or misleading representation **to the plaintiff**."[16]

Even if Plaintiff could avoid this fatal flaw, there is no evidence that Maximus Federal made any "representation" to Treasury which could serve as the basis for its §1692e claim. Instead, the undisputed evidence demonstrates that FSA's DMCS system has internal logic that identifies accounts that have the BD Received tag placed on them and automatically generates a report to Treasury. [JA-966:3-8]. There is no evidence that Maximus Federal communicates directly with Treasury, or more importantly, did so with respect to Plaintiff's student loan accounts.

---

requires that it be true." Mendoza v. Diversified Consultants, Inc., No. 18-2005, 2019 WL 2524117, at *4 (E.D. Pa. June 18, 2019) (internal quotation marks and citations omitted). "The Third Circuit evaluates 15 U.S.C. §1692e claims of false, deceptive, or misleading representations under the 'least sophisticated debtor [or consumer]' standard." Good v. Nationwide Credit, Inc., 55 F. Supp. 3d 742, 747 (E.D. Pa. 2014) (citing Brown v. Card Serv. Ctr., 464 F.3d 450, 453-54 (3d Cir. 2006)).

[16] Volden v. Innovative Fin. Sys., Inc., 440 F.3d 947, 954 (8th Cir. 2006); see also O'Rourke v. Palisades Acquisition XVI, LLC, 635 F.3d 938 (7th Cir. 2011); Kropelnicki v. Siegel, 290 F.3d 118 (2d Cir. 2002).

Even if this automatically generated report from FSA's DMCS system could serve as the basis for her §1692e claim, there is nothing to suggest that this communication, which was actually received by Treasury approximately a week after Plaintiff's 2018 tax refund was offset, was false or misleading. Instead, the communication from the DMCS system indicates that a BD Received Tag was applied to Plaintiff's Student Loans and this was communicated to Treasury on May 3, 2019. [JA-614-627]. Plaintiff cannot use this automatically generated communication to sustain her §1692e claim.

### E.    There is no Evidence that Maximus Violated §1692f

Count II of Plaintiff's Complaint contends that Maximus Federal violated §1692f by using "unconscionable means" to collect on Plaintiff's Student Loans. The gravamen of Plaintiff's §1692f claim is that Maximus Federal violates "federal regulations and explicit instructions from the Department" by failing "to cease collection activity" during the pendency of a BD Application. However, the circumstances that led Treasury to offset Plaintiff's 2018 tax refund were caused by external factors outside of Maximus Federal's control. To characterize this brief delay, which was not caused by Maximus Federal, as an "unconscionable" collection practice would significantly expand the scope of FDCPA liability.

Section 1692f "sets out a nonexclusive list of conduct that qualifies as unfair or unconscionable."[17] Douglass v. Convergent Outsourcing, 765 F.3d 299, 302 (3d Cir. 2014).

---

[17] Section 1692f "operates as a catchall for conduct that is recognizably unfair, but not explicitly enumerated in other sections of the FDCPA." Kromelbein v. Envision Payment Sols., Inc., 2013 WL 3947109, at *11 (M.D. Pa. Aug. 1, 2013) (quoting Hoover v. Monarch Recovery Mgmt., Inc., 888 F.Supp.2d. 589, 601 (E.D. Pa. 2012)). Courts have interpreted "unfair or unconscionable" as practices that are 'shockingly unjust or unfair, or affronting the sense of justice, decency, or reasonableness.'" Howard v. LVNV Funding, LLC, No. 3:19-CV-93, 2020 WL 978653, at *7 (W.D. Pa. Feb. 28, 2020) (quoting Arias v. Gutman, Mintz, Baker, & Sonnenfeldt LLP, 875 F.3d 128, 135 (2d Cir. 2017)).

Plaintiff's Amended Complaint focuses her §1692f claim on subsection (1) which prohibits "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. §1692f(1).

Here, the underpinning of Plaintiff's §1692f claim is her contention that Maximus Federal ignores the "automatic stay" and fails to cease "collection activity" after a borrower has submitted a BD application.  (D.I. 29 ¶1).  Specifically, Plaintiff's §1692f claim is based on the contention that Maximus Federal violated 34 C.F.R. § 685.222 and the relevant "instructions" from FSA by failing to cease "collection activity," thereby causing Maximus Federal to "collect" on a debt that is not "permitted by law."  (D.I. 29 ¶¶58-62).  34 C.F.R. § 685.222 provides that after receiving a BD application, "**the Secretary**..." will "[s]uspend[] collection activity on the loan until the Secretary issues a decision on the borrower's claim."[18]  Plaintiff alleges that Maximus Federal failed to follow FSA's instructions, and therefore violated §1692f.  Even if this were true, which it is not, FSA's "instructions" do not have the force of law and cannot serve as the basis of her §1692f claim.

Notwithstanding, Plaintiff's §1692f claim fails because the record conclusively demonstrates that the DMCS system had policies and procedures in place to stop "collection activity." [JA-693-749; JA-681-692; JA-755-774].  As described herein, the evidence shows that the limited delay in applying the BD Received Tag to Plaintiff's account was the result of external factors over which Maximus Federal had no control (and all of which were known to FSA).  [JA-

---

[18] It is worth noting that this regulation is promulgated pursuant to Title IV, Part D of the Higher Education Act of 1965 ("HEA") and is designed to regulate the activities of the Secretary of Education.  It does not provide for an express or implied private right of action.  Negash, 2017 WL 4277085.

599-602].  This short period of delay cannot serve as the basis for an alleged violation of 34 C.F.R. §685.222 or any "instructions" from FSA, and it certainly cannot support Plaintiff's claim of an "unconscionable" collection practices pursuant §1692f.

### F.    Maximus Federal is Shielded from Liability by the "Bona Fide Error" Defense

Even if Maximus Federal's actions violated the FDCPA (they did not), Maximus Federal is entitled to summary judgment because the offset of Plaintiff's 2018 tax refund was the result of a number of external factors despite the maintenance of robust procedures which are intended to prevent this very action from occurring.  These facts present a classic case for the application of the Bona Fide Error defense.

The Bona Fide Error defense provides a safe harbor for FDCPA violations where they (1) were unintentional; (2) the result of a bona fide error; and (3) the bona fide error occurred despite the maintenance of procedures reasonably adopted to avoid such error.  See 15 U.S.C. §1692k(c); see also Daubert v. NRA Grp., LLC, 861 F.3d 382, 393 (3d Cir. 2017).  Maximus Federal has established the requisite elements of the Bona Fide Error defense and Plaintiff has no competent evidence to the contrary.

#### i.    The Withholding of Plaintiff's Tax Refund was Unintentional

Plaintiff's 2018 tax refund was withheld by Treasury, **not** Maximus Federal.  Even assuming this act could be attributed to Maximus Federal, there is no evidence that Maximus Federal intentionally took any action that would result in the offset of Plaintiff's 2018 tax refund.[19]

---

[19] "A violation is unintentional for purposes of the . . . bona fide error defense if the debt collector lacked the specific intent to violate the [FDCPA]." Johnson v. Riddle, 443 F. 3d 723, 728-29 (10th Cir. 2006); see also Regan v. Law Offices of Edwin A. Abrahamsen & Assocs., P.C., C.A. No. 8-5923, 2009 WL 4396299, at *7 (E.D. Pa. Dec. 1, 2009) ("a debt collector need show only that 'the violation was unintentional, not that the [act] itself was unintentional...") (citations omitted).

Instead, the undisputed facts establish that Plaintiff's Student Loans were originally certified for TOP offset in 2015. [JA_825:6-826:12]. Plaintiff confirmed that her prior tax refunds were previously offset and this had happened multiple times prior to the offset of her 2018 tax refund. [Id.]. The evidence further establishes that Maximus Federal is wholly unaware a borrower has submitted a BD application (nor does it receive the application itself) until it retrieves the requisite information from CEMS and has the opportunity to review and apply the requisite tags to a borrower's account. [JA-108:3-15]. As described above, Plaintiff's account was part of approximately 14,000 BD applications that were identified and assigned to Maximus Federal on April 1, 2019. [JA-814-15; JA-1026:8-1028:16]. Maximus Federal was expressly directed by FSA not to work these files until FSA had the opportunity to remove the unnecessary files through a subsequent Mass File Update. [JA-906:21-907:9; JA-1027:17-1028:5]. This did not occur until April 9, 2019 and Maximus was not even able to begin working through the backlog of the over 2,400 BD applications that remained until April 10, 2019. [JA-903:22-905:17; JA-699-700]. As described above, Maximus did not have the employees necessary as a result of a change in security clearance protocols and it remained in constant communication with FSA regarding this issue. [JA-600-JA-602]. Plaintiff cannot in good faith argue Maximus Federal was aware of Plaintiff's BD application simply because it was one of 2,400 BD Applications that needed to be worked within the DMCS system.

Maximus Federal applied the BD Received tag to Plaintiff's account on April 29, 2019, just 4 days after her 2018 tax refund was offset by Treasury.[20] [JA-936:7-937:9; JA-18-19]. The

---

[20] The undisputed evidence demonstrates that Maximus Federal worked through the backlog and eventually applied the BD Received Tag to Plaintiff's account. These actions show its actions were unintentional. See West v. Abendroth & Russell Law Firm, 45 F. Supp. 3d 959, 967 (N.D. Iowa 2014) (finding "no reasonable juror could conclude that [defendant] intended to violate the FDCPA" where, among other things, defendant "upon realizing her mistake" corrected the

evidence clearly establishes that the delay in applying the BD Received tag to Plaintiff's account was caused by factors completely outside of Maximus Federal's control.  The evidence further establishes that the tax offsets by Treasury occur as part of an automated system.[21]  Thus, the offset of Plaintiff's 2018 tax refund was unintentional on the part of Maximus Federal.  See Isaac v. RMB, Inc., 2014 WL 1278096 (Mar. 27, 2014).

### ii.  The Withholding of Plaintiff's Tax Refund was a Bona Fide Error

Plaintiff's tax refund was withheld due to a Bona Fide Error for which Maximus Federal cannot be held liable.  An error is "bona fide" for purposes of the FDCPA if it was "made in good faith; a genuine mistake."  Balon v. Enhanced Recovery Co., Inc., 316 F.R.D. 96, 102 (M.D. Pa. 2016) (citations omitted).  "The second and third prongs of the [bona fide error] defense are objective and require an inquiry into whether any precautions were actually implemented, and whether such precautions 'were reasonably adapted to avoid the specific error at issue.'"  Agostino v. Quest Diagnostics, Inc., No. CIV.A. 04–4362 SRC, 2011 WL 5410667 at *4 (D.N.J. Nov. 3, 2011) (quoting Johnson v. Riddle, 443 F.3d 723, 728–29 (10th Cir. 2006)).

Here, the undisputed evidence shows that the DMCS system has robust procedures to stop collection activity after submission of a BD application, which is the very basis of Plaintiff's FDCPA claim. [JA-985:18-986:15; JA_338-346; JA-755-774; JA-978:8-979:15].  As set forth

---

error alleged to have violated the FDCPA); see also Hyman v. Tate, 362 F.3d 965, 967 (7th Cir. 2004) (defendant was entitled to bona fide error defense where, among other things, it immediately ceased collection efforts after learning of plaintiff's bankruptcy filing).

[21] Courts have recognized that collection activity that occurs automatically or as part of a computer generated process occur "unintentionally" pursuant to the Bona Fide Error defense.  See Smith v. Transworld Sys., Inc., 953 F.2d 1025, 1031 (6th Cir. 1992) (finding defendant was entitled to the bona fide error defense despite mailing collection letter to Plaintiff after receiving cease and desist letter because the mailing was "inadvertent[ly]" computer generated and was thus not intentional);

herein, the brief delay in applying the relevant electronic tags to Plaintiff's account was caused by a confluence of external factors.  [JA-599-602].  Courts have routinely applied this defense in similar situations.  For example, courts have found that a bona fide error occurred where a defendant failed to apply, or inadvertently removed, an electronic code in a defendant's servicing system which led to an allegedly improper communication and/or collection activity.[22]

In Isaac, the Court applied the Bona Fide Error defense to a defendant who had an internal policy of ceasing collection calls after receipt of a cease-and-desist letter by locating and properly logging them in their system.   Isaac v. RMB, Inc, 2014 WL 1278096 (N.D. Ala. Mar. 27, 2014). However, the defendant in Isaac did not properly log these cease-and-desist letters for a period of "at least 17 days" "because the two key employees who were in place to prevent the violations were both unavailable due to medical conditions, one on maternity leave and one due to an unexpected illness."  Id. at *8-9.  Yet, the Court found the Bona Fide Error defense applied because the subject calls "made in violation of Section 1692c(c) were not intentional, and resulted from a bona fide error."  Id. at *8.  The same type of "errors" are present here and the application of the electronic codes to a borrower's account, and the related delays, are precisely the type of "clerical errors" that serve as the basis of a Bona Fide Error defense.

### iii.    The Relevant Procedures were Reasonably Designed to Prevent the Error

The third prong of the Bona Fide Error analysis is satisfied because the record establishes that the relevant DMCS policies were reasonably designed to prevent borrowers who submitted a

---

[22] See Washington v. Convergent Outsourcing, Inc., 2017 WL 1093152, at *1, 4 (N.D. Ill. Mar. 23, 2017) (holding that a bona fide error occurred where defendant's employee, while processing a letter from Plaintiff's counsel disputing the debt, manually updated Plaintiff's account with the wrong code); see also Rush v. Portfolio Recovery Associates, 977 F. Supp. 2d 414, 427-28 (D.N.J. 2013) (finding defendant's policy to apply "do-not-call code" to Plaintiff's account to prevent future calls was reasonably designed and subject to the bona fide error defense).

BD application from being subject to TOP offsets.  [JA-681-749; JA-755-774].  The evidence shows that these procedures were not only reasonably designed, they worked with a high degree of effectiveness.  [JA-941:4-942:4].

The third prong of the bona fide error test is satisfied where a defendant establishes that it had in place "procedures reasonably adapted to avoid" the error alleged by the plaintiff.[23] Gebhardt v. LJ Ross Assocs., Inc., C.A. No. 15-2154, 2017 WL 2562106, at *5 (D.N.J. June 12, 2017); see also Glover v. FDIC, 698 F.3d 139, 149 (3d Cir. 2012) (the bona fide error defense "immuniz[es] a debt collector for an unintentional violation where reasonable error-avoidance procedures have been employed").  The standard does not require defendants to take every precaution conceivable to prevent errors.[24]

As described above, the DMCS system maintains detailed procedures that were designed to stop collection activity in the DMCS system.[25]  [JA-681-749; JA-755-774].  These procedures were expressly approved by FSA.  [Id.].  Maximus Federal representatives testified that these

---

[23] The term "procedures" has been interpreted as "processes that have mechanical or other such 'regular orderly' steps to avoid mistakes — for instance, the kind of internal controls a debt collector might adopt to ensure its employees do not communicate with consumers at the wrong time of day…or make false representations as to the amount of a debt." Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, 559 U.S. 573, 587 (2010).

[24] See also Katz v. Asset Acceptance, LLC, C.A. No. 05-2783, 2006 WL 3483921, at *2 (E.D.N.Y. Nov. 30, 2006) (finding that defendant's procedures need not be "fool proof" to qualify for the bona fide error defense); Hyman v. Tate, 362 F.3d 965, 968 (7th Cir. 2004) ("Although [the debt collector] could have done more . . . §1692k(c) only requires collectors to adopt reasonable procedures."); Wilhelm v. Credico, Inc., 519 F.3d 416, 421 (8th Cir. 2008) (elaborate procedures are not required where issue is not complex).

[25] It is worth noting that Maximus Federal is just one of the contractors involved in noting BD Applications in the DMCS system.  For example, Centure, a separate and distinct contractor, is responsible for receiving and routing the BD Applications through CEMS to Maximus Federal. Centure can take weeks to process the BD Applications it receives and assign them to the appropriate entity.  For example, Plaintiff's application was received by Centure on March 14, 2019, but was not assigned to Maximus Federal through the CEMS system until April 1, 2019.

-29-

procedures are periodically audited to ensure they are functioning properly. [JA-941-942]. These procedures were not only reasonably designed, they were highly effective.  For example, the record shows that once the BD Received tag was applied to Plaintiff's student loans on April 29, 2019, **she was not subjected to any collection activity**.  [JA-18-19].  In addition, the DMCS system maintained policies and procedures to look for any offsets or involuntary payments received after the date of a borrowers BD application and refund any such offsets. [JA-338-346; JA-713-722; JA-688-89; JA-755-774].

Moreover, as described in detail above, Maximus analyzed two different samples of borrower accounts at FSA's request. [JA-628-629].  Maximus Federal's analysis showed an exceedingly low percentage of borrowers (approximately .04%) who did not have the relevant BD Received Tag applied to their accounts as a result of a "manual processing errors." (See Section II(C)(4) above).  During this process, Maximus Federal also identified a "blind spot" in the DMCS system logic for identifying refunds due to the date a payment was posted from Treasury.[26]  [JA-940:15-941:14].  However, this "blind spot" affected a limited number of borrowers and was corrected.  [JA-584-586].  The undisputed evidence shows that for the vast majority of borrowers, this process worked effectively to stop all third-party collections and refund any payments that were received.  [JA-548].  Thus, the overwhelming weight of the evidence demonstrates that these procedures were "reasonable" and Maximus Federal is entitled to summary judgment.[27]

---

[26] The refund process which examined the DMCS system for payments that were due to be refunded after a BD Received tag was applied was also highly effective, with nearly 92% effectiveness. [JA-547-551]. However, the failure to refund the TOP offset is not identified as a basis for Plaintiff's claims.

[27] Later communications from FSA describe the CEMS system, which is maintained and operated by entirely separate government contractor, as a "leaky cup" that needed to have another cup placed underneath to avoid borrower's falling through. [JA-433].  Therefore, Plaintiff cannot rely

G.    **Maximus Federal Is Entitled To Contractor Immunity**

Maximus Federal is immune from Plaintiff's claims because, at all relevant times, it was acting pursuant to a valid contract, and at the direction of FSA.  [JA-380-431].  Courts have routinely held that government contractors, such as Maximus Federal, are shielded from liability and provided immunity for their conduct in furtherance of agreements with the federal government. This is precisely the case here. Plaintiff is not permitted to attack the validly conferred and approved procedures of FSA through the veil of an FDCPA claim against its contractor.

The Supreme Court has long held that a government contractor cannot be held liable for conduct carried out pursuant to a contract with the federal government.  Yearsley v. W.A. Ross Construction Co., 309 U.S. 18, 21 (1940); Campbell-Ewald Co. v. Gomez, 136 S. Ct. 663, 673 (2016).  In applying what has become known as the Yearsley Doctrine, Courts examine whether the contractor's "authority to carry out the project was validly conferred" and if so, "there is no liability on the part of the contractor for executing [the government's] will."[28]  Id. at 20-21; see also Beaver Valley Power Co. v. Nat'l Eng'g & Contracting Co., 883 F.2d 1210, 1215 n.4 (3d Cir. 1989). "[U]nder Yearsley, a government contractor is not subject to suit if (1) the government authorized the contractor's actions and (2) the government 'validly conferred' that authorization, meaning it acted within its constitutional power."  Cunningham v. Gen. Dynamics Info. Tech.,

_____

on the existence of borrowers associated with the Manriquez Litigation to undermine the policies and procedures set forth in DMCS.

[28] The purpose of this doctrine is self-evident because precluding such immunity could directly impede the federal government's significant interest in the completion of its work and its unquestioned need to delegate government functions.  See Carley v. Wheeled Coach, 991 F.2d 1117, 1120 (3d Cir. 1993); Butters v. Vance Int'l, Inc., 225 F.3d 462, 466 (4th Cir. 2000); see also Koutsoubos v. Boeing Vertol, Div. of Boeing Co., 553 F. Supp. 340, 342 (E.D. Pa. 1982);

Inc., 888 F.3d 640, 643 (4th Cir. 2018).  However, there is no immunity where a contractor violates the law and "the government's explicit instructions." Id. at 647.  (citations omitted).  The Yearsley Doctrine "has also been applied to federal causes of action and, most recently, the Supreme Court even addressed Yearsley in relation to the TCPA." Id., at 646. (citations omitted).

Maximus Federal has met the requisite elements for the Yearsley Doctrine.  It is undisputed that Maximus Federal is a government contractor who was retained to, among other things, operate and maintain FSA's DMCS system.  [JA-380-431].  Maximus Federal's responsibilities under the terms of the Contract are heavily regulated and dictated by FSA.  [JA-380-431; JA-963:1-9; JA-883:1-4; JA-891:21-892:4].   In fact, the Contract includes approximately 3,000 individual requirements that Maximus Federal must follow.  [JA-775-781].

As relevant here, the Contract was modified through CR 4619 and CR 4753 which provide for the application of electronic tags in FSA's DMCS system upon receiving notice of a borrower's BD application through the CEMS system. [JA-681-692; JA-755-774]. The process of retrieving the requisite borrower information from the CEMS system and applying the appropriate tags was expressly authorized and approved by FSA and this process was followed for Plaintiff's electronic tags in the DMCS system.  [JA-338-346; JA-693-749; JA-755-774].   Thus, Maximus Federal satisfies the first prong of the Yearsley Doctrine because it was acting pursuant to the authority, and at the direction of, FSA.[29]

---

[29] See Richland-Lexington Airport Dist. v. Atlas Properties, Inc., 854 F. Supp. 400, 421 (D.S.C. 1994) ("if the authority were validly bestowed on the contractor and the contractor did not exceed the scope of the authority so conferred, the contractor cannot be held liable for executing the will of the sovereign."); Nichole Med. Equip. & Supply, Inc. v. TriCenturion, Inc., 694 F.3d 340, 351 (3d Cir. 2012) (finding defendants "as Medicare contractors" were entitled to immunity even for discretionary conduct" as long as the conduct fell "within the outer perimeter of their official duties").

Second, the Contract and subsequent CR's were a proper delegation from FSA. "An authorization is 'validly conferred' on a contractor if Congress authorized the government agency to perform a task and empowered the agency to delegate that task to the contractor." <u>Cunningham v. Gen. Dynamics Info. Tech., Inc</u>., 888 F.3d 640, 647 (4th Cir. 2018). It is uncontested that FSA has the authority to engage private contractors, like Maximus Federal, to carry out the maintenance and operation of FSA's DMCS system.[30] FSA thus has the authority to operate and maintain the DCMS system and the Contract is a valid means for FSA to carry out this necessary task.

Maximus Federal expects Plaintiff will attempt to side-step the immunity afforded to Maximus Federal by arguing that it violated or disregarded the express instructions from FSA. Specifically, Plaintiff is likely argue that Maximus Federal failed to follow the directions of FSA by neglecting to apply the BD Received Tag within the "five business days" provided for in CR 4753. As described in detail above, this contention ignores the other relevant provisions of CR 4619, along with the undisputed facts, that affected this time frame.[31] These delays were caused by external factors entirely outside Maximus Federal's control and exceeded the binding

---

[30] Specifically, Congress has provided FSA with the authority to establish and administer the National Student Loan Data System, which comprises the DCMS (<u>see</u> 20 U.S.C. § 1092b(a)-(d)), along with the power to "enter into...contracts...with...private organizations" like Maximus Federal, "as the Secretary may determine necessary or appropriate to carry out functions of...the [FSA]." 20 U.S.C. § 3475(b).

[31] Maximus Federal expects Plaintiff will argue that these assumptions do not "expressly" modify the 5 business day time frame to apply BD Received tags on a borrower's account. However, a common sense reading of these provisions together demonstrates that Maximus Federal's only obligation for BD application volumes which exceeded 75-80 per day was to "assess the impact, inform FSA, and work collaboratively to resolve the backlog." If this were not the case, the assumption would be entirely superfluous and the need to "collaborate for resolution" for the excess volume would be entirely unnecessary. It is well-accepted that courts should not interpret contracts in a way that would render a term or condition superfluous and Courts should endeavor to read a contract's provisions as one. <u>Rathblott v. PeopleStrategy, Inc</u>., 685 F. App'x 107, 109 (3d Cir. 2017). The same is true here.

contractual "assumptions" in CR 4619.  The undisputed evidence shows that Maximus Federal communicated with FSA regarding the volume increases, the funding delays, and the screening process that affected Maximus Federal's ability to work the overflow.  These communications ultimately culminated in the CAP that was accepted and approved by FSA and identified various root causes which had nothing to do with actions or inactions of Maximus Federal.  In sum, Maximus Federal: (1) applied the requisite tags; and (2) worked with FSA to cure backlogs in CEMS.  Both were permissible and within the express provisions of the Contract with FSA.

Plaintiff will also attempt to rely on FSA's letter of concern sent in October 2019 that references Maximus Federal's alleged failure to follow certain contractual terms in applying the requisite tags in the DMCS system to cease collection activity.  However, as described above, Maximus Federal's response and the subsequent analysis that was conducted showed that Maximus was not violating any contractual provisions.  In fact, while FSA suggested it would "thoroughly relate poor performance in the Contractor Performance Assessment Reports for any failure to adhere to the CR," no such admonishment or alleged violation ever appeared in the relevant FSA entries into the Federal government's Contractor Performance Assessment Reporting System ("CPARS").[32] [JA-314-325].  In contrast, the relevant CPARS reports for 2019 identified

---

[32] Government Agencies are instructed to use the CPARS to create and measure the quality and timely reporting of contractor performance information. Past performance information is relevant information regarding a contractor's actions under previously awarded contracts or orders. It includes the contractor's record of conforming to contract requirements and to standards of good workmanship; forecasting and controlling costs; adherence to schedules, including the administrative aspects of performance; reasonable and cooperative behavior and commitment to customer satisfaction; reporting into databases; integrity and business ethics; and business-like concern for the interest of the customer. See Federal Acquisition Regulation ("FAR") 42.1501, 48 CFR § 42.501.

Maximus Federal's performance as "satisfactory" and failed to identify any issues with Maximus Federal's processing of BD applications in the CEMS system.[33]  [Id.]

Thus, the weight of the evidence conclusively shows that Maximus Federal never violated FSA's express instructions in identifying and applying the relevant tags associated BD applications, and more specifically, with Plaintiff's BD Application.  Thus, Maximus Federal satisfies the requisite elements for the application of the Yearsley Doctrine and it is therefore entitled to the dismissal of Plaintiff's FDCPA claims in their entirety.

Respectfully submitted,

**SAUL EWING ARNSTEIN & LEHR LLP**

s/ *Marisa Rachel De Feo*
Ryan DiClemente
Marisa Rachel De Feo
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Telephone: (215) 972-1976

Dated:  January 29, 2021

---

[33] Ms. Smith testified that these issues identified with the "call center" staffing and correspondence would not include Maximus Federal's obligations relating to its role in processing BD applications in the DMCS system. [JA-1000:24-1001:8]. Even if this were not the case, the CPAR acknowledged that the issues with call center and correspondence was caused, in part, by issues outside Maximus Federal's control and there is nothing suggesting the issues identified herein relate to the processing of BD applications in the DMCS system and/or any contractual requirement.  [JA-314-325].